JENKINS *v.* McKEITHEN, GOVERNOR OF
LOUISIANA, ET AL.

No. 548.   Argued March 25, 1969.—Decided June 9, 1969.

412

*J. Minos Simon* argued the cause and filed a brief for appellant.

*Ashton L. Stewart,* Special Assistant Attorney General of Louisiana, argued the cause for appellees. With him on the brief was *Jack P. F. Gremillion,* Attorney General.

MR. JUSTICE MARSHALL announced the judgment of the Court and delivered an opinion in which MR. CHIEF JUSTICE WARREN and MR. JUSTICE BRENNAN join.

This case involves the constitutionality of a 1967 Louisiana statute, known as Act No. 2, which creates

a body called the Labor-Management Commission of Inquiry. La. Rev. Stat. Ann. §§ 23:880.1–23:880.18 (Supp. 1969). The stated purpose of this Commission is "the investigation and findings of facts relating to violations or possible violations of criminal laws of the state of Louisiana or of the United States arising out of or in connection with matters in the field of labor-management relations . . . ." Act No. 2, Preamble, [1967 Extra. Sess.] La. Acts 3. Appellant, a member of a labor union, filed this suit in the District Court for the Eastern District of Louisiana challenging the constitutionality of Act No. 2 and of certain actions taken by state officials in the administration of the Act and otherwise. He sought both declaratory and injunctive relief. A three-judge court was convened and that court ultimately granted appellees' motion to dismiss the complaint. *Jenkins* v. *McKeithen,* 286 F. Supp. 537 (D. C. E. D. La. 1968). We noted probable jurisdiction of an appeal brought under 28 U. S. C. § 1253.[1] We reverse.

Since the case was decided on a motion to dismiss, a rather detailed examination of the structure of the Act and of the allegations of the complaint is necessary.

## I.

The impetus for the formation of the Commission was stated in the preamble of the Act. [1967 Extra. Sess.] La. Acts 2. It cited "unprecedented conditions" in the labor relations of the construction industry, and it particularly noted certain "allegations and accusations of violations of the state and federal criminal laws which should be thoroughly investigated in the public interest . . . ." *Id.,* at 3. The additional investigative facilities of the Commission were thought necessary to

---

[1] The constitutionality of the Act was upheld in *Martone* v. *Morgan,* 251 La. 993, 207 So. 2d 770, appeal dismissed, 393 U. S. 12 (1968) (petition for rehearing pending).

"supplement and assist the efforts and activities of the several district attorneys, grand juries and other law enforcement officials and agencies . . . ." *Ibid.*

The Commission is composed of nine members appointed by the Governor. La. Rev. Stat. Ann. § 23:880.1 (Supp. 1969). It is empowered to act only upon referral by the Governor when, in his opinion, there is substantial indication that there are or may be "widespread or continuing violations of existing criminal laws" affecting labor-management relations. La. Rev. Stat. Ann. § 23:880.5 (Supp. 1969). Upon referral by the Governor, the Commission is to proceed by public hearing to ascertain the facts pertaining to the alleged violations. La. Rev. Stat. Ann. § 23:880.6 (Supp. 1969). In order to carry out this function, the Commission has the power to make appropriate rules and regulations, to employ attorneys, investigators, and other staff members, to compel the attendance of witnesses, to examine them under oath, and to require the production of books, records, and other evidence. La. Rev. Stat. Ann. § 23:880.8 (Supp. 1969). It can enforce its orders by petition to the state courts for contempt proceedings. La. Rev. Stat. Ann. § 23:880.9 (Supp. 1969).

The scope of the Commission's investigative authority is explicitly limited by the Act to violations of criminal laws. "The commission shall have no power, authority or jurisdiction to investigate, hold hearings or seek to ascertain the facts or make any reports or recommendations on any of the strictly civil aspects of any labor problem . . . ." La. Rev. Stat. Ann. § 23:880.6 B (Supp. 1969).[2] Further, the Commission has no power to

---

[2] "[I]ts power, authority or jurisdiction shall in no case extend to (1) any matter which is solely an 'unfair labor practice' or an 'unfair employment practice' or a legitimate labor dispute under the provisions of any federal or state law; or (2) any matter which relates to legitimate economic issues arising between labor and

participate in any manner in any civil proceeding, except, of course, contempt proceedings. *Ibid.* The limitation of the Commission to criminal matters is further reinforced by the provision of the Act allowing the Commission, at the request of the Governor, to assign its investigatory forces to the state police to assist the latter in their investigatory activities. La. Rev. Stat. Ann. § 23:880.6 C (Supp. 1969).

The Commission is required to determine, in public findings, whether there is probable cause to believe violations of the criminal laws have occurred. La. Rev. Stat. Ann. § 23:880.7 A (Supp. 1969). Its power is limited to making these findings and recommendations:

> "The commission shall have no authority to and it shall make no binding adjudication with respect to such violation or violations; however, it may, in its discretion, include in its findings the conclusions

management or the manner in which such labor practices or economic issues are to be settled between the parties, whether by negotiation, arbitration, lockout or strike; or (3) any matter which relates solely to the internal affairs of labor organizations, including but not necessarily restricted to membership policies, election procedures, membership rights and like matters; or (4) any alleged acts of violence or threats of violence or so-called 'mass picketing,' or like conduct by either an employer or a union, which is not related to bribery or extortion, as defined by law, but which is related only to an organizational objective of a labor union or which is related only to furthering the interests of one side or the other in a 'labor dispute,' as that term is defined by federal or state law, such conduct being already regulated by and subject to the police power of the state, exercised through such agencies as the Division of State Police; or (5) any matter which relates solely to the internal affairs of any business organization, including but not necessarily restricted to its labor and business policy and general operations, or (6) any matters which constitute a combination of any two or more of these." La. Rev. Stat. Ann. § 23:880.6 B (Supp. 1969).

of the commission as to specific individuals . . . and it may make such recommendations for action to the governor as it deems appropriate." *Ibid.*

The findings are to be a matter of public record, La. Rev. Stat. Ann. § 23:880.15 B (Supp. 1969), although they may not be used as prima facie or presumptive evidence of guilt or innocence in any court of law, La. Rev. Stat. Ann. § 23:880.7 A (Supp. 1969). The Commission is required to report its findings to the proper state or federal authorities if it finds there is probable cause to believe that violations of the criminal laws have occurred, and it may file appropriate charges. La. Rev. Stat. Ann. § 23:880.7 B (Supp. 1969). Finally, the Commission may request the Governor to refer matters to the State Attorney General asking the latter to exercise his authority to cause criminal prosecutions to be instituted. La. Rev. Stat. Ann. § 23:880.7 D (Supp. 1969). Nothing in the Act makes any provision for preparation of findings or reports for submission to the Governor or the legislature for the explicit purpose of legislative action. Indeed, the preamble of the Act and the Act itself make it clear that the purpose of the Commission is to supplement the activities of the State's law enforcement agencies in one narrowly defined area.

As indicated above, the Commission has the power to compel the attendance of witnesses. A witness is given notice of the general subject matter of the investigation before being asked to appear and testify. La. Rev. Stat. Ann. § 23:880.10 A (Supp. 1969). A witness has the right to the presence and advice of counsel, "subject to such reasonable limitations as the commission may impose in order to prevent obstruction of or interference with the orderly conduct of the hearing." La. Rev. Stat. Ann. § 23:880.10 B (Supp. 1969). Counsel may question his client as to any relevant matters, *ibid.*, but the

right of a witness or his counsel to examine other witnesses is limited:

"In no event shall counsel for any witness have any right to examine or cross-examine any other witness but he may submit to the commission proposed questions to be asked of any other witness appearing before the commission, and the commission shall ask the witness such of the questions as it deems to be appropriate to its inquiry." *Ibid.*

With one limited exception to be discussed below, neither a witness nor any other private party has the right to call anyone to testify before the Commission.

Although the Commission must base its findings and reports only on evidence and testimony given at public hearings, the Act does provide for executive session when it appears that the testimony to be given "may tend to degrade, defame or incriminate any person." La. Rev. Stat. Ann. § 23:880.12 A (Supp. 1969). In executive session the Commission must allow the person who might be degraded, defamed, or incriminated an opportunity to appear and be heard, and to call a reasonable number of witnesses on his behalf. *Ibid.* However, the Commission may decide that the evidence or testimony shall be heard in a public hearing, regardless of its effect on any particular person. *Ibid.* In that case, the person affected has the right to appear as a "voluntary witness" and may submit "pertinent" statements of others. *Ibid.* He may submit a list of additional witnesses, but subpoenas will be issued only in the discretion of the Commission. *Ibid.;* see also La. Rev. Stat. Ann. § 23:880.12 C (Supp. 1969).

## II.

Appellant's complaint named as defendants the Governor of Louisiana and six members of the Commission. The complaint presented, *inter alia,* the question of

whether the provisions of Act No. 2 violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Appellant alleged that the Commission was an executive trial agency "aimed at conducting public trials concerning criminal law violations," and that its function was publicly to condemn. Appellant asserted that the defendants

> "in connection with the administration of the provisions of said Act, have singled out complainant and members of Teamsters Local No. 5 as a special class of persons for repressive and willfully punitive action . . . in furtherance of which a deliberate effort has been made and continues to be made by said officials . . . to destroy the current power structure of the labor union aforesaid . . . ."

More specifically, the complaint alleged that appellees and their agents, acting under color of law and in conspiracy, procured false statements of criminal activities and used such statements to initiate baseless criminal proceedings against appellant, that they intimidated and coerced public officials into filing and prosecuting false criminal charges against appellant, and that they knowingly, willfully, and purposefully intimidated state court judges having under consideration legal controversies involving appellant. These acts of appellees allegedly deprived appellant and all others similarly situated of "rights, privileges and immunities secured to them by the Constitution and laws of the United States." Finally, appellant alleged that the appellees intended to continue to deprive him and others of their rights and that there was no "plain, adequate or efficient remedy at law."

Appellant prayed that a three-judge district court be convened, that a temporary restraining order issue, that Act No. 2 be declared unconstitutional, that all civil

and criminal actions against appellant be permanently restrained, and that other unspecified relief be granted.

Temporary relief was denied by the District Court and a three-judge court was impanelled to hear the case. Appellees answered and moved to dismiss. They alleged that appellant lacked standing to question the constitutionality of Act No. 2 and that the complaint failed to state a cause of action. Thereafter, appellant filed a "Supplemental and Amending Petition" in which he alleged, in some detail, that appellees had continued the course of action described in the original complaint. After a hearing, the court dismissed the complaint. *Jenkins* v. *McKeithen, supra.*

The court, relying largely on the opinion of the Louisiana Supreme Court in *Martone* v. *Morgan,* 251 La. 993, 207 So. 2d 770, appeal dismissed, 393 U. S. 12 (1968) (petition for rehearing pending), held that this Court's decision in *Hannah* v. *Larche,* 363 U. S. 420 (1960), was dispositive of the issue of the constitutionality of the Act. The court further ruled that appellant had not stated any other claim for relief under §§ 1981, 1983, and 1988 of Title 42, United States Code. Rather, the court held that the other matters sought to be raised in the complaint were merely potential defenses to the pending criminal charges and that appellant had not alleged any basis for restraining prosecution of those charges. Finally, the court ruled that appellant's suit was not a proper class action under Rule 23 of the Federal Rules of Civil Procedure.[3] The court did not explicitly rule on the issue of whether appellant lacked standing to challenge the Act.

Appellant presents two questions for review in this Court: Whether Act No. 2 is constitutional and whether

---

[3] Appellant does not assign this ruling as error on this appeal.

the complaint otherwise states a cause of action under 42 U. S. C. §§ 1981, 1983, and 1988.

## III.

We are met at the outset with appellees' assertion that appellant lacks standing to attack the constitutionality of Act No. 2. This argument is based in part upon certain allegations in the complaint that Act No. 2 is unconstitutional because it denies to "a person compelled to appear before . . . [the] Commission" the right to effective assistance of counsel, the right of confrontation, and the right to compulsory process for the attendance of witnesses. Since appellant did not allege in his complaint that he was called to appear before the Commission or that he expected to be called, appellees assert that he lacks standing to assert the denial of rights to those who do appear. See, e. g., *Tileston* v. *Ullman,* 318 U. S. 44 (1943). Further, appellees argue that appellant lacks standing because he cannot demonstrate that he has been, or will be, "injured" by the operation of the challenged statute. We cannot agree.

The present case was decided on appellees' motion to dismiss, in which appellees contested appellant's standing to challenge the constitutionality of the Act. As noted above, the court below made no explicit reference to the issue of standing. But since the question of standing goes to this Court's jurisdiction, see *Flast* v. *Cohen,* 392 U. S. 83, 94–101 (1968), we must decide the issue even though the court below passed over it without comment. Cf. *Tileston* v. *Ullman, supra.*

For the purposes of a motion to dismiss, the material allegations of the complaint are taken as admitted. See, e. g., *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172, 174–175 (1965). And, the complaint is to be liberally construed in favor of plaintiff. See Fed. Rule Civ. Proc. 8 (f); *Conley* v.

*Gibson,* 355 U. S. 41 (1957). The complaint should not be dismissed unless it appears that appellant could "prove no set of facts in support of his claim which would entitle him to relief." *Conley* v. *Gibson, supra,* at 45–46. With these rules in mind, we turn to an examination of the allegations of appellant's complaint.

It is true, as appellees assert, that appellant alleges deprivations of rights of those who are or will be called to testify before the Commission and that he fails to allege that he was or will be called to testify. If this were the extent of appellant's allegations, we would agree that appellant lacks standing to challenge the Act. However, appellant's allegations are not limited to those mentioned by appellees. Appellant alleged that the Commission was an "executive trial agency" whose function was to conduct public trials designed to find appellant and others guilty of violations of criminal laws, allegedly for the purpose of injuring him and destroying the labor union of which he was a member. More specifically, appellant alleged that

> "said Commission of Inquiry exercises (a) an accusatory function, (b) its duty to find that named individuals are responsible for criminal law violations, (c) it must advertise such findings, and (d) its findings serve as part of the process of criminal prosecution . . . ."

Finally, the complaint alleged that the appellees, acting in concert with others and in connection with the administration of the Act, have actually engaged in a course of conduct designed publicly to brand appellant and others as criminals, including, as noted above, the filing of allegedly baseless criminal charges against appellant.

Thus, although the complaint is inartfully drawn, it does allege that the Commission and those acting in concert with it have taken and will take in the future certain

actions with respect to appellant. The issue is thus whether those allegations are sufficient to give appellant standing to challenge the constitutionality of the Act creating the Commission and the actions taken by the Commission under authority of that Act. We think that they are.

The concept of standing to sue, as we noted in *Flast* v. *Cohen, supra,* "is surrounded by the same complexities and vagaries that inhere in [the concept of] justiciability" in general. 392 U. S., at 98. Nevertheless, the outlines of the concept can be stated with some certainty. The indispensable requirement is, of course, that the party seeking relief allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions . . . ." *Baker* v. *Carr*, 369 U. S. 186, 204 (1962); see *Flast* v. *Cohen, supra; Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 151 (1951) (concurring opinion). In this sense, the concept of standing focuses on the party seeking relief, rather than on the precise nature of the relief sought. See *Flast* v. *Cohen, supra,* at 99–100. The decisions of this Court have also made it clear that something more than an "adversary interest" is necessary to confer standing. There must in addition be some connection between the official action challenged and some legally protected interest of the party challenging that action. See *Flast* v. *Cohen, supra,* at 101–106.

In the present case, it is clear that appellant possesses sufficient adversary interest to insure proper presentation of issues facing the court. His allegations, if taken as true, indicate that the Commission and those acting in concert with it have carried out a series of public acts designed to injure him in various ways. Appellant's interest in his own reputation and in his economic well-

being guarantee that the present proceeding will be an adversary one.

We also think that appellant has alleged that the Act's administration was the direct cause of sufficient injury to his own legally protected interests to accord him standing to challenge the validity of the Act. We are not presented with a case in which any injury to appellant is merely a collateral consequence of the actions of an investigative body. See *Hannah* v. *Larche, supra,* at 443; cf. *Sinclair* v. *United States,* 279 U. S. 263, 295 (1929); *McGrain* v. *Daugherty,* 273 U. S. 135, 179–180 (1927). Rather, it is alleged that the very purpose of the Commission is to find persons guilty of violating criminal laws without trial or procedural safeguards, and to publicize those findings. Moreover, we think that the personal and economic consequences alleged to flow from such actions are sufficient to meet the requirement that appellant prove a legally redressable injury. Those consequences would certainly be actionable if caused by a private party and thus should be sufficient to accord appellant standing. See *Greene* v. *McElroy,* 360 U. S. 474, 493, n. 22 (1959); *Joint Anti-Fascist Refugee Committee* v. *McGrath, supra,* at 140–141 (opinion of Burton, J.); *id.,* at 151–160 (Frankfurter, J., concurring). It is no answer that the Commission has not itself tried to impose any direct sanctions on appellant; it is enough that the Commission's alleged actions will have a substantial impact on him. See, *e. g., Columbia Broadcasting System, Inc.* v. *United States,* 316 U. S. 407 (1942); cf. *NAACP* v. *Alabama,* 357 U. S. 449, 460–463 (1958). Finally, in the circumstances of the present case, we do not regard appellant's opportunity to defend any criminal prosecutions as sufficient to deprive him of standing to challenge the Act. Cf. *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299 (1927). Appellant's allegations go beyond the normal publicity attend-

ing criminal prosecution; he alleges a concerted attempt publicly to brand him a criminal without a trial. Further, he alleges that he has been unsuccessful in his attempts to secure prosecution of the charges against him.

We hold that appellant's complaint contains sufficient allegations of direct and substantial injury to his own legally protected interests to accord him standing to challenge the constitutionality of Act No. 2.

## IV.

We thus reach the merits of appellant's contention that Act No. 2 is unconstitutional. Appellant's complaint is long and inartfully drawn; it contains many allegations of wrongdoing on the part of the Commission and other state officials. But the only issue presented by this aspect of the case is whether the Act creating the Commission is constitutional, either on its face or as applied. Many of appellant's allegations are relevant to this latter contention, but many involve issues that the court below ruled were properly matters to be raised in defense of any criminal prosecutions which might take place. We will deal with those allegations in the final section of this opinion.

Appellees, like the court below, rely heavily on this Court's decision in *Hannah* v. *Larche, supra.* In *Hannah,* this Court upheld the Civil Rights Commission against challenges similar to those involved in the present case. Indeed, Act No. 2 was drafted with *Hannah* in mind and the structure and powers of the Commission here are similar to those of the Civil Rights Commission. See *Jenkins* v. *McKeithen,* 286 F. Supp., at 540; *Martone* v. *Morgan, supra.* We cannot agree, however, that *Hannah* controls the present case, for we think that there are crucial differences between the issues presented by this complaint and the issues in *Hannah.*

The appellants in *Hannah* were persons subpoenaed to appear before the Civil Rights Commission in connection with complaints about deprivations of voting rights. They objected to the Civil Rights Commission's rules about nondisclosure of the complainants and about limitations on the right to confront and cross-examine witnesses. This Court ruled that the Commission's rules were consistent with the Due Process Clause of the Fifth Amendment. The Court noted that

> " '[d]ue process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." 363 U. S., at 442.

In rejecting appellants' challenge to the Civil Rights Commission's procedures, the Court placed great emphasis on the investigatory function of the Commission:

> "[I]ts function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action." 363 U. S., at 441.

The Court noted that any adverse consequences to those being investigated, such as subjecting them to public opprobrium, were purely conjectural, and, in any case, were merely collateral and "not . . . the result of any affirmative determinations made by the Commission . . . ." 363 U. S., at 443. *Morgan* v. *United States,* 304 U. S. 1 (1938), *Joint Anti-Fascist Refugee Committee* v. *McGrath, supra,* and *Greene* v. *McElroy, supra,* were distinguished on the ground that "[t]hose cases . . . involved . . . determinations in the nature of adjudications affecting legal rights." 363 U. S., at 451.

We reaffirm the decision in *Hannah.* In our view, however, the Commission in the present case differs in a substantial respect from the Civil Rights Commission and the other examples cited by the Court in *Hannah.* It is true, as the Supreme Court of Louisiana has held, *Martone* v. *Morgan, supra,* that the Commission does not adjudicate in the sense that a court does, nor does the Commission conduct, strictly speaking, a criminal proceeding. Nevertheless, the Act, when analyzed in light of the allegations of the complaint, makes it clear that the Commission exercises a function very much akin to making an official adjudication of criminal culpability. See *Joint Anti-Fascist Refugee Committee* v. *McGrath, supra.*

The Commission is limited to criminal law violations; the Act explicitly provides that the Commission shall have no jurisdiction over civil matters in the labor-management relations field. Indeed, the Commision is even limited to certain types of criminal activities.[4] As noted above, nothing in the Act indicates that the Commission's findings are to be used for legislative purposes. Rather, everything in the Act points to the fact that it is concerned only with exposing violations of criminal laws by specific individuals. In short, the Commission very

---

[4] See n. 2, *supra.*

clearly exercises an accusatory function; it is empowered to be used and allegedly is used to find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public.

Given this view of the purpose of the Labor-Management Commission of Inquiry, we agree with Justice Frankfurter, concurring in the result in *Hannah* v. *Larche:*

> "Were the [Civil Rights] Commission exercising an accusatory function, were its duty to find that named individuals were responsible for wrongful deprivation of voting rights and to advertise such finding or to serve as part of the process of criminal prosecution, the rigorous protections relevant to criminal prosecutions might well be the controlling starting point for assessing the protection which the Commission's procedure provides." 363 U. S., at 488.

When viewed from this perspective, it is clear the procedures of the Commission do not meet the minimal requirements made obligatory on the States by the Due Process Clause of the Fourteenth Amendment. Specifically, the Act severely limits the right of a person being investigated to confront and cross-examine the witnesses against him. Only a person appearing as a witness may cross-examine other witnesses. Cross-examination is further limited to those questions which the Commission "deems to be appropriate to its inquiry," and those questions must be submitted, presumably beforehand, in writing to the Commission. We have frequently emphasized that the right to confront and cross-examine witnesses is a fundamental aspect of procedural due process. See, *e. g., Willner* v. *Committee on Character and Fitness,* 373 U. S. 96, 103–104 (1963); *Greene*

v. *McElroy, supra,* at 496–499, and cases cited. In the present context, where the Commission allegedly makes an actual finding that a specific individual is guilty of a crime, we think that due process requires the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights. Cf. *Pointer* v. *Texas,* 380 U. S. 400 (1965).

The Commission's procedures also drastically limit the right of a person investigated to present evidence on his own behalf. It is true that he may appear and call a "reasonable number of witnesses" in executive session, but should the Commission decide to hold a public hearing, he is limited to presentation of his own testimony and the "pertinent" written statements of others. The right to present oral testimony from other witnesses and the power to compel attendance of those witnesses may be denied in the discretion of the Commission. The right to present evidence is, of course, essential to the fair hearing required by the Due Process Clause. See, *e. g., Morgan* v. *United States, supra,* at 18; *Baltimore & Ohio R. Co.* v. *United States,* 298 U. S. 349, 368–369 (1936). And, as we have noted above, this right becomes particularly fundamental when the proceeding allegedly results in a finding that a particular individual was guilty of a crime. Cf. *Washington* v. *Texas,* 388 U. S. 14 (1967); *In re Oliver,* 333 U. S. 257, 273 (1948). We do not mean to say that the Commission may not impose reasonable restrictions on the number of witnesses and on the substance of their testimony; we only hold that a person's right to present his case should not be left to the unfettered discretion of the Commission.

Appellant argues that the procedures contemplated by the Act are deficient in other respects. In particular, he alleges that the Act provides no meaningful rules of

evidence and fails to provide standards of guilt or innocence. He also alleges that the Act deprives him of effective assistance of counsel. We have, however, said enough to demonstrate that appellant has alleged a cause of action for declaratory and injunctive relief. Whether the Due Process Clause requires that the Commission provide all the procedural protections afforded a defendant in a criminal prosecution, or whether something less is sufficient, are questions that we think should be initially answered by the District Court on remand. As we have noted, "[w]hether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors." *Hannah* v. *Larche, supra,* at 442. We think it inappropriate to rule on the extent to which the Commission's procedures may run afoul of the Due Process Clause on the basis of the record before us, barren as it is of any established facts. That issue is best decided in the first instance by the District Court in light of the evidence adduced at trial.

We do not mean to say that this same analysis applies to every body which has an accusatory function. The grand jury, for example, need not provide all the procedural guarantees alleged by appellant to be applicable to the Commission. As this Court noted in *Hannah,* "the grand jury merely investigates and reports. It does not try." 363 U. S., at 449. Moreover, "[t]he functions of that institution and its constitutional prerogatives are rooted in long centuries of Anglo-American history." *Id.,* at 489–490 (Frankfurter, J., concurring in the result). Finally the grand jury is designed to interpose an independent body of citizens between the accused and the prosecuting attorney and the court. See *Stirone* v. *United States,* 361 U. S. 212, 218 (1960); *Ex parte Bain,* 121 U. S. 1, 11 (1887); *Hannah* v. *Larche, supra,* at 497–499 (dissenting opinion). Investigative bodies such as the Commission have no claim to specific

constitutional sanction. In addition, the alleged function of the Commission is to make specific findings of guilt, not merely to investigate and recommend. Finally, it is clear from the Act and from the allegations of the complaint that the Commission is in no sense an "independent" body of citizens. Rather, its members serve at the pleasure of the Governor, La. Rev. Stat. Ann. § 23:880.1 (Supp. 1969), and it cannot act in the absence of a "referral" from the Governor, La. Rev. Stat. Ann. §§ 23:880.5, 23:880.6 A (Supp. 1969).

We also wish to emphasize that we do not hold that appellant is now entitled to declaratory or injunctive relief. We only hold that he has alleged a cause of action which may make such relief appropriate. It still remains for him to prove at trial that the Commission is designed to and does indeed act in the manner alleged in his complaint, and that its procedures fail to meet the requirements of due process.

## V.

As noted above, appellant also alleges in his complaint that appellees, and those acting in concert with them, have engaged in a course of conduct, both pursuant to the Act and otherwise, that has resulted in the filing of false criminal charges against appellant. He alleges numerous other related actions allegedly depriving him of his rights secured by the Constitution. The complaint seeks declaratory and injunctive relief with regard to these acts; in particular, appellant prays that the District Court enjoin all civil and criminal actions pending or to be instituted against him. To the extent that these allegations involve actions taken under the direct authority of Act No. 2, we think that they may properly be considered by the District Court in determining the constitutionality of the Act. However, the District Court characterized many of appellant's allegations as

involving merely potential defenses to the criminal charges assertedly pending. In the exercise of its discretion and because the issues were "intertwined" with the issue of the constitutionality of the Act, the court passed upon the question of whether appellant had alleged a cause of action for declaratory and injunctive relief. Relying in part on its determination that the Act was constitutional, the court held that appellant had not stated a claim for declaratory or injunctive relief and that appellant's remedy was to defend any criminal prosecutions then pending or that might be brought. *Jenkins* v. *McKeithen, supra,* 286 F. Supp., at 542–543. Whether the court will take the same view of the propriety of passing on the question or of the merits in light of our holding and the evidence adduced at trial cannot be determined at this time. Accordingly, we think that issue should be left open for reconsideration on remand.

The judgment of the court below is reversed and the cause is remanded for further proceedings.

*It is so ordered.*

MR. JUSTICE DOUGLAS concurs in the result for the reasons stated in his dissenting opinion in *Hannah* v. *Larche,* 363 U. S. 420, 493–508 (1960).

MR. JUSTICE BLACK, concurring.

I concur in the Court's judgment and in much of what is said in the prevailing opinion. I cannot agree, however, to reaffirming *Hannah* v. *Larche,* 363 U. S. 420. I joined the dissent of MR. JUSTICE DOUGLAS in the *Hannah* case and still adhere to that dissent. The Louisiana law here, like the federal law considered in the *Hannah* case, is, in my judgment, nothing more nor less than a scheme for a nonjudicial tribunal to charge, try, convict, and punish people without courts, without juries, without lawyers, without witnesses—in short, without

any of the procedural protections that the Bill of Rights provides. The Louisiana law is reminiscent of the old Parliamentary and Ecclesiastical Commission trials which took away the liberty of John Lilburne and his contemporaries without due process of law—that is, without giving them the benefit of a trial in accordance with the law of the land. For these reasons I believe that the Louisiana law denies due process of law.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

Swept up in a constitutional revolution of its own making, the Court has a tendency to lose sight of the principles that have traditionally defined and limited its role in our political system. Constitutional adjudication is a responsibility we cannot shirk. But it is a grave and extraordinary process, one of last resort. And when it cannot legitimately be avoided, it is a function that must be performed with the utmost circumspection and precision, lest the Court's opinions emanate radiations which unintentionally, and spuriously, indicate views on matters we have not fully considered.

Over the years, the Court has evolved a number of principles designed to assure that we act within our proper confines. Perhaps the most fundamental of these is that we adjudicate only when, and to the extent that, we are presented with an actual and concrete controversy. Today, in its haste to make new constitutional doctrine, the Court turns this principle on its head, as it attempts to create a controversy out of a complaint which alleges none. With respect, I must dissent.

I.

Only last Term, in *Flast* v. *Cohen,* 392 U. S. 83 (1968), the Court reaffirmed the proposition that "when standing [to sue] is placed in issue in a case, the question is

whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue . . . ," *id.*, at 99–100, that is, "whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Id.*, at 102. In the present context, this means, simply, that for a plaintiff to challenge a particular course of conduct pursued or threatened to be pursued by a defendant, it is not enough for the plaintiff to allege that he has been or will be injured by the defendant; the plaintiff must further claim that the injury to him (or to those whom he has status to represent[1]) results from the particular course of conduct he challenges.

Appellant in the case at bar attacks the constitutional validity of certain specific statutory procedures of the Louisiana Labor-Management Commission of Inquiry. Applying the principle stated above, it is not sufficient that he may be injured by the Commission or its members in *some* way. The injury must be alleged to arise out of, or relate to, the application of the procedures in question. The most generous reading of appellant's complaint cannot mask the simple truth that it falls short of this minimal requirement.

At the risk of wearying the reader, I must deal with appellant's pleadings in some detail. The relevant portion of the complaint, and that relied upon by the Court, is part IV ("Facts"), which contains 17 operative paragraphs.

Paragraphs 1–3 identify the plaintiff and defendants.

Paragraphs 4–6 characterize the Commission as an "executive trial agency," and outline its investigative functions. Paragraph 7 avers that the Commission's procedures for performing these functions are constitu-

---

[1] As the prevailing opinion notes, *ante,* at 420, and n. 3, appellant does not assign as error the District Court's holding that this was not a proper class action.

tionally defective with respect to matters of counsel, confrontation, compulsory process, rules of evidence, standards of guilt, right of appeal, and self-incrimination. Nowhere, either directly or indirectly, do these paragraphs intimate that *appellant* (or for that matter, anyone else) has been affected by the procedures themselves and their asserted effects.

Paragraph 8 should be quoted in full:

"Furthermore complainant alleges that said defendants, their agents, representatives and employees, and those acting in concert with them, in connection with the administration of the provisions of said Act, have singled out complainant and members of Teamsters Local No. 5 as a special class of persons for repressive and willfully punitive action, solely because they are members of said Teamsters Local No. 5, in furtherance of which a deliberate effort has been made and continues to be made by said officials, spearheaded by defendant McKeithen, while acting under color of state law, to destroy the current power structure of the labor union aforesaid and said union to which complainant belongs as a member and through which he experiences economic survival, and to install a new power structure oriented and subservient to the James R. Hoffa group or clique of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; this effort has included and continues to include (a) the deliberate circulation for public consumption of willful falsehoods about members of said labor union, such as characterizing said members as 'hoodlums' and 'gangsters,' comparable in depravity to the sinister Mafia gangsters of underworld criminals, while masking such lawless conduct behind a verbal facade of law and order, (b) the indiscriminate filing of

criminal charges against members of said labor union, where there exists no justifiable basis therefor and the concomitant exaction of excessive bail bonds, (c) the intimidating of public officials into carrying out the tyrannical aims of such indiscriminate criminal prosecution, and (d) the dictatorial use of the powers of the office of Governor of Louisiana in furtherance thereof."

In paragraph 9, appellant avers, "as more specifically applies to him," that appellees conspired to file false criminal charges against him. Paragraphs 10–14 describe in detail the chronology and conduct of the resulting criminal proceedings.

Paragraph 15 alleges that appellees intimidated certain persons (not including appellant) in order to elicit false statements to bring about the prosecution of other persons (not including appellant).

Finally, paragraph 16 contains the usual averments requisite to equitable and declaratory relief, and paragraph 17 requests a temporary restraining order.

Reading and re-reading these many paragraphs of legal and factual averments, one cannot help but be struck by the conspicuous absence of any claim that *appellant* has been or will be *investigated* by the Commission, or called as a *witness* before it, or identified in its *findings,* or, indeed, subjected to any of its processes.[2] Can this lacuna be filled by implication? I believe not.

Only paragraphs 9–14 relate specifically to appellant, and they contain no hint that the filing of the criminal informations against him was the result of the Commission's use of any of the procedures which the Court today indicates are constitutionally suspect. And assuming, contrary to fact, see n. 1, *supra,* that appellant repre-

---

[2] And, of course, there is no suggestion that appellant ever requested that the Commission accord him any of the rights of whose absence he complains.

sents others besides himself in this action, the only other arguably germane paragraph is ¶8 (a), which alleges the "deliberate circulation for public consumption of willful falsehoods about members of said labor union." This paragraph conspicuously omits any suggestion that such "falsehoods" were the result of testimony before the Commission or that they were contained in the Commission's "findings"—a term that is repeatedly emphasized in the earlier description of the Commission's functions.

The complaint's utter failure to allege any connection between the injuries asserted to have been suffered by appellant and the procedures complained of is not, on any objective reading of the complaint, an accidental omission or the result of counsel's "inartfulness"—as my Brother MARSHALL would put it. In my view, the only plausible inference—especially when it is remembered that appellant was represented by counsel throughout this litigation—is that such allegations were omitted because appellant had no facts to support them.[3]

The prevailing opinion's strained construction of the complaint goes well beyond the principle, with which I have no quarrel, that federal pleadings should be most liberally construed. It entirely undermines an important function of the federal system of procedure—that of disposing of unmeritorious and unjusticiable claims at the outset, before the parties and courts must undergo the expense and time consumed by evidentiary hearings.

Accordingly, I would sustain the dismissal of the complaint on the ground that appellant has not shown himself to have standing to challenge the Commission's procedures.

---

[3] This inference is supported by the Report of the Labor-Management Commission of Inquiry, filed in this Court, which, other than mentioning the litigation challenging the Commission, nowhere refers to this appellant.

## II.

Because the complaint is barren of any indication of the manner in which appellant is affected by the Commission's formal procedures, the prevailing opinion is required to make its own assumptions. It places appellant in the vague position of "a person being investigated" by the Commission, *ante,* at 428, 429, and thence proceeds to discuss the rights of such a person to confront witnesses and to offer evidence in his own behalf. The prevailing opinion appears understandably reluctant to commit itself to very much. As I read the opinion, it does not state that any of the Commission's procedures are actually unconstitutional, but holds only that there is enough latent in the complaint that the case should proceed to trial.

Of necessity, however, my Brother MARSHALL has to examine some of the constitutional issues sought to be raised by appellant in order to justify a remand, and his discussion leaves radiations which are, at least, unclear. Reluctant as I am, under the circumstances of this case, to discuss the merits, I therefore feel compelled to outline my own views. I am not certain to what extent they comport with those of the majority.

The prevailing opinion fails to articulate what I deem to be a constitutionally significant distinction between two kinds of governmental bodies. The first is an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing. To the extent that such a determination—whether called a "finding" or an "adjudication"—finally and directly affects the substantial personal interests, I do not doubt that the Due Process Clause may require that it be accompanied by many of the traditional adjudicatory procedural safeguards. Cf. *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123 (1951).

By the terms of the Louisiana legislation, the appellee Commission is not of this sort. Its authority is "investigatory and fact finding only." La. Rev. Stat. Ann. § 23:880.6 A (Supp. 1969). Its stated purpose is "to supplement and assist the efforts and activities of the several district attorneys, grand juries and other law enforcement officials and agencies of the State of Louisiana." Preamble to Act No. 2. Its duty, when it finds probable cause to believe that the criminal laws have been violated, is to "report its findings and recommendations to the proper federal and state authorities . . . charged with the responsibility for prosecution of criminal offenses," or to file charges itself. La. Rev. Stat. Ann. § 23:880.7 B (Supp. 1969). The Commission has no authority to adjudicate a person's guilt or innocence, and its recommendations and findings have no legal consequences whatsoever. *Id.,* § 23:880.7 A (Supp. 1969).

The Commission thus bears close resemblance to certain federal administrative agencies, *infra,* this page and 440, and to the offices of prosecuting attorneys. These agencies have one salient feature in common, which distinguishes them from those designed simply to "expose." None of them is the *final* arbiter of anyone's guilt or innocence. Each, rather, plays only a *preliminary* role, designed, in the usual course of events, to *initiate* a subsequent formal proceeding in which the accused will enjoy the full panoply of procedural safeguards. For this reason, and because such agencies could not otherwise practicably pursue their investigative functions, they have not been required to follow "adjudicatory" procedures.

I see no constitutionally relevant distinction between this State Commission and the federal administrative agencies that perform investigative functions designed to discover violations which may result in the initiation of criminal proceedings. In *Hannah* v. *Larche,* 363 U. S. 420, 445-448, 454-485 (1960), the Court expressly

condoned the denial of "rights such as apprisal, confrontation, and cross-examination" in such "nonadjudicative, fact-finding investigations." *Id.*, at 446. The Court recognized, for example, that the Federal Trade Commission

> "could not conduct an efficient investigation if persons being investigated were permitted to convert the investigation into a trial. We have found no authorities suggesting that the rules governing Federal Trade Commission investigations violate the Constitution, and this is understandable since any person investigated by the Federal Trade Commission will be accorded all the traditional judicial safeguards at a subsequent adjudicative proceeding . . . ." *Id.*, at 446.

And the Court said of the Securities and Exchange Commission:

> "Although the Commission's Rules provide that parties to adjudicative proceedings shall be given detailed notice of the matters to be determined, . . . and a right to cross-examine witnesses appearing at the hearing, . . . those provisions of the Rules are made specifically inapplicable to investigations, . . . *even though the Commission is required to initiate civil or criminal proceedings if an investigation discloses violations of law.* Undoubtedly, the reason for this distinction is to prevent the sterilization of investigations by burdening them with trial-like procedures." *Id.*, at 446–448. (Emphasis added.)

The statutory safeguards afforded persons being investigated by the Louisiana Commission are at least equal to those provided by most of these federal agencies. See *id.*, at 454–485.

The Commission's functions also find close analogies in the investigations and determinations that take place

daily in the offices of state and federal prosecuting attorneys. In both instances, the responsible officials proceed by interrogating persons with knowledge of possible violations of the criminal law. If the prosecutor believes that an individual has committed a crime, he files an information or seeks a grand jury indictment. When the Commission reaches a similar conclusion, it turns its intelligence over to a prosecutor so that he may initiate the formal criminal process.

For obvious reasons, it has not been seriously suggested that a "person under investigation" by a district attorney has any of the "adjudicative" constitutional rights at the investigative stage.[4] These rights attach only after formal proceedings have been initiated. Nor, of course, does one under investigation have a constitutional right that the investigations be conducted in secrecy, or that the official keep his plans to prosecute confidential. The decision whether or not to disclose these matters rests in the sound discretion of the responsible public official. Various factors, such as the fear that a suspect will flee or the concern for obtaining an unbiased jury when the matter comes to trial, may militate in favor of secrecy. On the other hand, an appropriate disclosure of a pending investigation may bring forth witnesses and evidence, and serves a proper ancillary function in keeping the public informed.[5]

---

[4] Of course, a person called upon to *participate* in the investigation, *e. g.,* by answering questions, may have relevant rights at this stage. Cf., *e. g., Mancusi* v. *DeForte,* 392 U. S. 364 (1968). But appellant does not intimate, and the majority does not assume, that he has been or will be subpoenaed to testify or produce documents.

[5] It is ironic that appellant should complain of the open nature of the Commission's proceedings. The statutory requirement that the Commission "shall base its findings and reports only upon evidence and testimony given at public hearings," La. Rev. Stat. Ann. § 23:880.12 A (Supp. 1969), is plainly designed to *protect* witnesses and persons under investigation from what some members of

The Commission's operations differ from those of a prosecuting attorney in one important respect, however. The very formality of the Commission's investigatory process may lend greater credibility and a greater aura of official sanction to the testimony given before it and to its findings. Although in this respect the Commission is not different from the federal agencies discussed above, I am not ready to say that the collateral consequences of government-sanctioned opprobrium may not under some circumstances entitle a person to some right, consistent with the Commission's efficient performance of its investigatory duties, to have his public say in rebuttal. However, the Commission's procedures are far from being niggardly in this respect. They include not only the right to make a personal appearance, but also the right to submit the statements of others, and, under some circumstances, to present questions to adverse witnesses. This is far more than is given persons under investigation by the federal agencies, and certainly serves adequately to neutralize any adverse collateral effects of the Commission's investigative proceedings.

As I noted above, the very insubstantiality of appellant's complaint leaves it unclear what the Court holds today. It may be that some of my Brethren understand the complaint to allege that in fact the Commission acts primarily as an agency of "exposure," rather than one which serves the ends required by the state statutes. If so—although I do not believe that the complaint can be reasonably thus construed—the area of disagreement between us may be small or nonexistent.

Before the Court holds that a purely investigatory agency must adopt the full roster of adjudicative safe-

---

the Court have criticized as secret inquisitions or Star Chamber proceedings. See *In re Groban,* 352 U. S. 330, 337 (1957) (BLACK, J., dissenting); *Anonymous* v. *Baker,* 360 U. S. 287, 298 (1959) (BLACK, J., dissenting).

guards, however, it would do well to heed carefully its own warning in *Hannah,* that such a requirement "would make a shambles of the investigation and stifle the agency in its gathering of facts." 363 U. S., at 444. Such a requirement would not only incapacitate state criminal investigatory bodies at a time when their need cannot be gainsaid, but would cast a broad shadow of doubt over the propriety of long-standing procedures employed by many federal agencies—procedures which less than a decade ago the Court believed to be proper and necessary.