**MARTIN MARIETTA CORPORATION, Plaintiff,**

v.

**INTERNATIONAL TELECOMMUNICATIONS SATELLITE ORGANIZATION (INTELSAT), Defendant.**

**Civ. A. No. MJG–90–1840.**

United States District Court, D. Maryland.

May 13, 1991.

Benjamin R. Civiletti, Jeffrey A. Dunn, James A. Dunbar, John A. McCauley, Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

William D. Rogers, Douglas A. Dworkin, Christopher M. Painter, Matthew A. Frumin, Lauren Gilbert, Arnold & Porter, Washington, D.C., and J. Hardin Marion, William W. Carrier, III, Tydings and Rosenberg, Baltimore, Md., for defendant.

GARBIS, District Judge.

This case involves the allocation of loss resulting from a failed satellite mission. Although the details may be complex, the essential facts can be stated simply.

International Telecommunications Satellite Organization ("INTELSAT") is an organization which operates commercial satellite and telecommunications systems for international clients representing approximately 119 countries. In August of 1987, INTELSAT contracted with Martin Marietta Corporation ("Martin Marietta") for the launch of two INTELSAT satellites on Titan III launch rockets. Martin Marietta

agreed to furnish launch services to deliver each of the two satellites into orbit. In return, INTELSAT agreed to pay a fixed price for the launch of each satellite.

Martin Marietta's launch of the first satellite was unsuccessful, failing to properly place the satellite in the correct orbit. Shortly after the rockets lifted off, the satellite, along with the motor intended to boost it into the correct orbit (together referred to as the payload), failed to separate from the Titan III rocket at the correct time.[1] INTELSAT eventually was able to separate the satellite from the Titan rocket, but was unable to boost the satellite into the proper orbit. INTELSAT sustained substantial losses due to the failure of the mission to correctly position the satellite for use by INTELSAT. For example, INTELSAT paid Martin Marietta approximately $112 million dollars for the launch services alone, and experts have estimated that the cost of rescuing the satellite may run as high as $90 million dollars. In addition, the satellite does not function at its present orbit and is useless.

Martin Marietta brought the present action seeking a declaratory judgment to absolve Martin Marietta of any liability for the incident. INTELSAT counterclaimed, asserting a breach of contract, and alleging negligence, gross negligence and negligent misrepresentation by Martin Marietta. In its Counterclaim, INTELSAT seeks damages for the lost value of the launch services, as well as for the lost use of the satellite, damage to the satellite and accompanying hardware, and the cost of rescuing the satellite, which rescue INTELSAT has yet to effect. Martin Marietta now seeks to dismiss INTELSAT's Counterclaim.[2] Because further proceedings are necessary to resolve the breach of contract issues, this decision addresses only the tort claims contained in INTELSAT's Counterclaim.

Under well settled law, Martin Marietta's Motion to Dismiss must be denied "unless it appears to a certainty that no possible set of facts could be proved to support [INTELSAT's] claim." *See Wolman v. Tose,* 467 F.2d 29, 35 (4th Cir.1972) (citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Equally established is the rule that, on a motion to dismiss, the facts are to be taken in the light most favorable to [INTELSAT]." *Id.* (citing *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)).

In its tort claims, INTELSAT seeks to recover from Martin Marietta damages for lost profits, lost use of the satellite, and rescue costs under theories of negligent misrepresentation, negligence and/or gross negligence. In its motion to dismiss, Martin Marietta contends that INTELSAT is precluded from recovering under any tort theory for two reasons. First, Martin Marietta argues that the Commercial Space Launch Act, a statute which requires all private commercial launch contracts to contain cross-waivers of liability, prohibits INTELSAT from bringing tort claims against Martin Marietta. Second, Martin Marietta contends that it owed INTELSAT no duty in tort, apart from those duties specified in the contract, to exercise reasonable care in performing the contract. Each argument will be addressed in turn.

*Preemption by The Commercial Space Launch Act*

The 1984 Commercial Space Launch Act, as amended in 1988, 49 U.S.C. app. §§ 2601–2623 (1988), requires all license holders who contract to provide private commercial space launch services to enter into reciprocal waivers of claims, under which all parties agree to assume their own risks of loss. 49 U.S.C. app. § 2615(a)(1)(C). According to the statute, all launch providers must obtain a license to conduct a private launch, 49 U.S.C. app. § 2605(a), and all licensees are subject to the reciprocal waiver provision.

■ In its motion to dismiss, Martin Marietta contends that by enacting the re-

---

1. The Court need not determine the reason or reasons for this failure in deciding the pending matters.

2. Should Martin Marietta's motion to dismiss be granted, the practical effect would be to grant the declaratory judgment sought by its Complaint.

ciprocal waiver provision requirement, Congress intended to preempt all state law tort claims brought in connection with the launch service contract. In particular, Martin Marietta argues that the statute itself automatically creates mandatory reciprocal waivers in all contracts between launch participants, even if the contract itself contains no express waiver provisions. Martin Marietta asserts that the statute "reads in" such waivers by virtue of Congress' preemptive authority over state contract law.

To determine whether Congress intended the Act to read into contracts the required waivers of liability, it is necessary to review both the historical background and the statutory language of the Amendments. Congress enacted the Commercial Space Launch Act to regulate private commercial satellite launches, and amended the statute in 1988 to encourage industry expansion in a rapidly shrinking market. Prior to the passage of the 1988 Amendments, this country's private commercial space launch industry faced virtual shut-down because commercial launchers incurred huge liability risks and were unable to procure insurance at any price. *Insurance and the U.S. Commercial Space Launch Industry,* (printed for Committee on Commerce, Science and Transportation, July 1988) at 4–5.

As a result, Congress created a comprehensive regulatory scheme to allocate tort liability among all commercial space launch participants, including the government. The 1988 Amendments to the Act provide that "each license shall require the licensee to enter into reciprocal waivers of claims with [launch participants]; each party agrees to be responsible for any property damage or loss it sustains or for any personal injury to, death of, or property damage or loss sustained by its own employees resulting from activities carried out under the license." 49 U.S.C. app.

§ 2615(a)(1)(C). The Act also required launch providers to insure against injuries sustained by third parties. 49 U.S.C. app. § 2615(a)(1)(A).

This Court rejects Martin Marietta's argument that the 1988 Amendments create liability waivers for contracts in which no waivers expressly have been agreed upon by the parties. Nowhere does the statutory language even begin to suggest that cross-waivers will be imputed into contractual agreements which do not contain express cross-waiver provisions. The statute requires only that the licensee include cross-waivers in its contract. Should the licensee fail to comply with such requirements, the Department of Transportation has the power to revoke the launch provider's license, or otherwise discipline the license holder. However, nothing in the language of the statute indicates that a launch participant cannot be held liable if the contract does not contain the required waivers.

In fact, the language in Martin Marietta's license,[3] which Martin Marietta procured pursuant to the Commercial Space Launch Act and the 1988 Amendments, declares that Martin Marietta can be held liable if cross-waivers are not provided in the contract itself. The license provides:

> In the event that Martin Marietta fails to enter into, or fails to require other private party launch participants to enter into, waivers of claims required under this subparagraph (a), Martin Marietta shall indemnify and be responsible for any and all liability, loss or damage resulting from such failure.

Further, Section 6(b) of the license requires Martin Marietta to certify to the Office of Commercial Space Transportation that it will indemnify and be responsible for liability if it fails to enter or include such cross-waivers.[4]

---

**3.** The parties stipulated that the Court could consider the license as if it had been made a part of the subject pleadings.

**4.** The license describes the cross-waivers required in Section 6(a):

> Martin Marietta shall enter into, and Martin Marietta shall require all other private party

launch participants to enter into, reciprocal waivers of claims under which each party to each such waiver agrees (i) to waive claims against the other private party launch participants, and against the government launch participants and their respective personnel involved in commercial launch activities; and (ii) to indemnify and be responsible for any

In light of the language of the statute and of the license itself, the Court rejects Martin Marietta's claim that the Commercial Space Launch Amendments operate to impute cross-waiver provisions into the contract if the contract itself does not have them. Therefore, it becomes necessary to determine the validity of INTELSAT's tort claims in light of the specific contract provisions.

*Tort Claims in General*

█ INTELSAT can succeed on its claims of negligence, gross negligence and negligent misrepresentation only if it can establish a duty in tort which exists separate and apart from the contractual duty. Martin Marietta argues, and the Court is persuaded, that INTELSAT cannot establish the existence of such a duty in tort distinct from the duty created by the contract. Beyond the duties of performance specified in the contract, Martin Marietta does not owe INTELSAT any duty of reasonable care in performance, other than (possibly) the duty not to intentionally, willfully or fraudulently abandon the contract.

█ The case of *Jacques v. First National Bank*, 307 Md. 527, 515 A.2d 756 (1986) outlines the three factors which are relevant in determining whether a duty exists in tort independent of contractual duty: (1) the nature of the harm—personal injury as opposed to purely economic damage; (2) the nature of the relationship—the existence of contractual privity; and (3) the nature of the parties themselves—their status as professionals, whether they hold themselves out as possessing special skill or expertise.

█ *Jacques* might be read to suggest that whenever two parties enjoy contractual privity, they owe each other a tort duty of reasonable care in performing the contract simply by virtue of the contractual relationship, despite the fact that the resulting injury may only be economic. However, in decisions issued after *Jacques*, Judges Smalkin and Motz of this Court have rejected such an interpretation, hold-

ing instead that "the fundamental distinction between tort and contract remains intact." *21st Century Properties v. Carpenter Insulation*, 694 F.Supp. 148, 151 (D.Md.1988). In *Flow Industries, Inc. v. Fields Const. Co.*, 683 F.Supp. 527, 530 (D.Md.1988), Judge Motz held that there can be no tort claim for a negligent breach of contract absent a legal obligation independent of the contract itself. *Id.* (citing *Heckrotte v. Riddle*, 224 Md. 591, 168 A.2d 879, 882 (1961)). Thereafter, Judge Smalkin held in *Nixon Uniform Service v. Am. Directory Service Agency*, 693 F.Supp. 367, 368 (D.Md.1988), that when no special circumstances or special relationships accompany the formation of a contract, no tort duty exists separate and distinct from a contractual duty.

The decisions in *Flow Industries* and *Nixon Uniform* recognize the fundamental distinction between claims in tort and claims in contract—contract duties are those specifically agreed upon by the parties, while tort duties are those imposed by the state for the purpose of protecting a vulnerable party. Judge Smalkin and Judge Motz both have acknowledged that in those instances where the relationship between parties is purely contractual, and the heart of plaintiff's claim is the defendant's failure to perform the contract, contract damages will suffice to compensate the plaintiff—no extra protection for the parties is necessary. "In that the essence of the relationship [is] contractual, only contract damages are recoverable." *Nixon*, 693 F.Supp. at 368 (citing *Baird v. C & P Tel. Co. of Baltimore*, 208 Md. 245, 258–59, 117 A.2d 873 (1955)).

Normally, contractual damages are sufficient for two reasons. First, where the relationship is purely contractual and the injury purely economic, parties have an opportunity to insure against such economic losses. *See East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986). Second, as noted in *Jacques*, where parties

property damage or loss it sustains or for any bodily injury to, death of, or property damage or loss sustained by its own employees result-

ing from commercial launch activities carried out under [the license] ...

are equally sophisticated in the general ways and affairs of business, the parties are in a position to contractually allocate risks among one another. *See Flow Industries v. Fields Const. Co.,* 683 F.Supp. 527, 530–31 (D.Md.1988).

In the case at bar, the parties had the opportunity to allocate the risk of economic loss to a third party, and were both sufficiently sophisticated to allocate the risks between themselves. Under Article 17.5.2 of this contract, INTELSAT agreed to assume responsibility for purchasing insurance to protect its property, but in fact, failed to purchase such insurance. Had it done so, the damage to INTELSAT's satellite and booster motor, as well as its lost profit, and costs to attempt rescue, could have been covered. Moreover, it is clear that both Martin Marietta and INTELSAT were sophisticated parties in positions of equal bargaining strength, able to adequately allocate risks and define duties between them.

On the facts in the instant case, this Court accepts the reasoning of Judges Motz and Smalkin in *Flow Industries, supra* and *Nixon Uniform, supra* and concludes that the parties have defined the full scope of their duties in the subject contract. Equally sophisticated parties who have the opportunity to allocate risks to third party insurance or among one another should be held to only those duties specified by the agreed upon contractual terms and not to general tort duties imposed by state law.

Accordingly, the Court will examine each of INTELSAT's tort claims to determine whether the contract defines the scope of Martin Marietta's duties with respect to the subject matter of those claims.

*Negligent Misrepresentation*

In its Motion to Dismiss, Martin Marietta makes two separate arguments regarding the claim for negligent misrepresentation.

First, Martin Marietta argues that it specifically disclaims liability for any representations it made[5] in the course of the contractual relationship. Second, even if it had not disclaimed liability, Martin Marietta contends that the contract which defines the relationship between the parties does not create a duty to avoid negligent misrepresentations.

To support its contention that it contractually disclaimed liability for all representations, Martin Marietta points to the warranty disclaimer included in the contract under Article 17.[6] However, INTELSAT interprets the warranty disclaimer language "has not made nor does make any representation ..." as applying only to representations made prior to and concurrent with the signing of the contract, but not representations made afterwards. INTELSAT interprets the contractual language as inapplicable to representations made after the signing of the contract. Under such an interpretation, which is reasonable in light of the language, Martin Marietta is not entitled to dismissal based upon the disclaimer clause.

■ However, even assuming that Martin Marietta had not disclaimed liability for representations made to INTELSAT during the course of the contractual relationship, INTELSAT cannot recover. Consistent with the Court's discussion of whether tort duties are applicable in contractual relationships, Maryland law holds that a claim for negligent misrepresentation is improper when, as here, the only relationship be-

---

**5.** Although Martin Marietta may contend that it made no representations at all, the Court assumes for the purpose of argument that it in fact made negligent misrepresentations.

**6.** The warranty disclaimer provision, Section 17.6, provides as follows:
MARTIN MARIETTA HAS NOT MADE NOR DOES MAKE ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF DE-

SIGN, OPERATION, CONDITION, QUALITY, SUITABILITY OR MERCHANTABILITY OR OF FITNESS FOR USE OR FOR A PARTICULAR PURPOSE, ABSENCE OF LATENT OR OTHER DEFECTS WHETHER OR NOT DISCOVERABLE, OR EXCEPT AS OTHERWISE PROVIDED IN ARTICLE 6, REFLIGHT/CASH REFUND GUARANTEE IF PURCHASED BY INTELSAT, ANY OTHER WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TITAN III OR ASSOCIATED EQUIPMENT.

tween the parties is contractual, both parties are equally sophisticated, and the contract does not create an express duty of due care in making representations. *Flow Industries v. Fields Const. Co.,* 683 F.Supp. at 527.

■ The case before the Court does not present circumstances in which the law creates a tort duty of due care independent from the parties' contractual relationship. Such tort duties of care with respect to representations are imposed by courts to protect a peculiarly vulnerable party. In particular, such duties are imposed in the context of a patient's or client's dealings with a professional in whom one places a great degree of personal trust and confidence—such as a physician, an attorney, an architect or a public accountant. *Jacques,* 515 A.2d at 763. No such relationship of special trust exists here. Nor is INTELSAT an unsophisticated consumer, unfamiliar with the subject matter of the contract, who relied on the representations of someone holding himself or herself out as possessing special expertise. *See Ward Development Co. v. Ingrao,* 63 Md.App. 645, 493 A.2d 421 (1985) (holding housing developer liable for negligent misrepresentation for grossly inaccurate estimate of water and sewer connection charges given to prospective homeowners who had no means of checking accuracy).

In this case, the contract itself imposes no duty on Martin Marietta to exercise due care to avoid negligence, and thus an action in tort is improper. As stated in *Flow Industries,* 683 F.Supp. at 530:

" '[t]he mere negligent breach of a contract, absent a duty imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.' " *Heckrotte v. Riddle,* 224 Md. 591, 595, 168 A.2d 879, 882 (1961). " 'To hold in cases such as the present one that a contractual relationship itself provides the duty of care necessary for the maintenance of a negligent misrepresentation claim would be to turn this principle into a syllogism. The contract, in effect, would become an 'independent duty imposed by law.' "

In sum, because no circumstances warrant the imposition on Martin Marietta of an extra-contractual tort duty to exercise reasonable care in making representations, INTELSAT is precluded from bringing a negligent misrepresentation claim.

*Gross Negligence*

■ Conceding that it is precluded by the contractual waivers in Article 17 from pursuing claims based on ordinary negligence for property damage, lost profits and incidentals, INTELSAT argues that public policy invalidates such waivers as they apply to gross negligence. It is true that courts normally find public policy to prohibit enforcement of contractual waivers of liability in cases of gross negligence. See *Boucher v. Riner,* 68 Md.App. 539, 543, 514 A.2d 485, 487 (1986) (holding that contractual waivers cannot shift risk of a party's own willful, wanton, reckless or gross conduct). However, the Court finds that in the special context of this case, public policy strongly favors enforcement of waivers of all tort claims, including those for gross negligence.

This case presents that rare instance in which Congress has actually pronounced public policy via legislation, here by requiring the parties to agree to contractual waivers under which each party assumes its own risk of loss. As noted above, prior to the 1988 Amendments to the 1984 Commercial Space Launch Act, the unwillingness of insurance companies to cover the huge liability risks incurred by private launch service providers seriously threatened the U.S. commercial space launch industry. In a successful effort to revive the industry, Congress passed legislation designed to eliminate the need for insurance, the primary roadblock to industry expansion, by requiring parties to waive their rights of recovery and assume the risk of their own loss.

■ The legislative history of the Amendments indicates that Congress intended the mandatory waivers to bar recovery in all instances, including cases where parties were grossly negligent. The Senate Report accompanying the 1988 Amendments states that Congress intended the mandatory waiver requirement "(1) to limit

the total universe of claims that might arise as a result of a launch; and (2) to eliminate the necessity for all of these parties to obtain property and casualty insurance to protect against these claims." S.Rep. No. 593, 100th Cong., 2nd Sess. 14 (1988), U.S.Code Cong. & Admin.News 1988, pp. 5525, 5538.

If this Court were to invalidate the subject tort claim waivers as they apply to gross negligence, it would substantially undermine the protections Congress intended for commercial space launchers. Plaintiffs would be able to sue for damages on every imperfect space launch, simply by claiming under a gross negligence theory rather than an ordinary negligence theory. The resulting costs of litigation, as well as the potential exposure, would require launch providers to obtain expensive insurance, if available, or alternatively to self insure and "bet the farm" on every space launch. This is precisely the situation Congress sought to avoid.

As mankind ventures forth from the home planet, great hazards, known and as yet unknown, will confront us. Now, and perhaps for as long as the human race seeks to go where it has not gone before, there shall be missions which cannot be "safe" as that term is used in the context of terrestrial activities. Those who seek to explore, and to exploit, outer space must do so charged with acceptance of the unknown, and perhaps unknowable, perils to be faced in that vast and potentially hostile environment.

The public policy of this country, as stated by Congress, requires that those using the service of a licensed space launch provider do so at their own risk. Accordingly, in order to carry out the Congressional intent behind the 1988 Amendments, the Court interprets the waivers in Article 17 of the contract to preclude liability for gross, as well as ordinary, negligence.

For the foregoing reasons, this Court concludes that INTELSAT may not recover on its tort claims.