HOGAN & HARTSON, Plaintiff,

v.

David M. BUTOWSKY, Defendant.

No. 77 Civ. 5661 (CES).

United States District Court,
S. D. New York.

Oct. 24, 1978.

Lord, Day & Lord, New York City, for plaintiff; John W. Castles, 3d, Eugene F. Bannigan, Michael J. Murphy, William P. Casella, New York City, of counsel.

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City, for defendant; Franklin B. Velie, Margot A. Metzner, New York City, of counsel.

## MEMORANDUM DECISION

STEWART, District Judge:

Defendant has moved to dismiss plaintiff's Amended and Verified Complaint (First Amended Complaint) for failure to state a claim upon which relief can be

granted. Plaintiff has moved to amend and supplement that complaint and add a new cause of action (Third Count). For the reasons stated below, we grant defendant's motion to dismiss. We reserve decision on plaintiff's motion to amend. Defendant also requests that reasonable attorneys' fees be granted on the grounds that plaintiff's action was brought in bad faith. This request is denied.

In November, 1972, the Securities and Exchange Commission brought an action against Robert L. Vesco and a number of other individuals and entities. *See: SEC v. Vesco, et al.*, 72 Civ. 5001. One of the defendants in that action was International Controls Corporation ("ICC"), of which Vesco had been a controlling shareholder. Primary among the SEC's allegations was that Vesco had improperly used ICC to gain control of and defraud various entities of the IOS organization.[1] Part of the relief obtained by the SEC in that action was a consent judgment entered into with ICC on March 16, 1973, which included provisions for the appointment of a Special Counsel to ICC and a new interim Board of Directors. Pursuant to that decree, this Court appointed David M. Butowsky, the defendant in this present action, as Special Counsel. Butowsky was authorized and directed to conduct an investigation into the affairs of ICC, particularly those matters related to the allegations of the SEC, and prepare a report of his findings to be filed with the Court and distributed to certain other interested parties. This report was to include an assessment of claims which might be asserted against ICC or by ICC against others as well as Butowsky's "recommendations for action" with respect to those claims. After considerable effort spanning some four and one half years, the "Report of Investigation of Special Counsel" ("Report"), which totals nearly eight hundred pages, was completed.

Portions of the Report concern the relationship between ICC and the plaintiff herein, Hogan & Hartson, a Washington, D.C. law firm which served as ICC's counsel during the period surveyed in the Report. Many of the statements made in the Report with respect to Hogan & Hartson are highly critical of its work as counsel to ICC and Vesco during the period of time in question. Specifically, plaintiff alleges that:

> "As it relates to plaintiff Hogan & Hartson [the Report] misstates facts, makes assumptions unsupported by fact, disregards facts reflected in contemporaneous documents, and reaches conclusions unsupported by reason or authority; all of which matters . . . would unfairly and unjustly stigmatize plaintiff Hogan & Hartson as violators of the Federal securities laws and as attorneys who breached their professional duties."

First Amended Complaint, ¶ 9.

On November 22, 1977, plaintiff brought an action to enjoin the filing of the Report, originally scheduled for November 25, 1977. The following day we denied plaintiff's application for a preliminary injunction, *Hogan & Hartson v. Butowsky*, Memorandum Decision dated November 23, 1977. This denial was affirmed on appeal and the Report was filed on November 29, 1977. On that same day, plaintiff filed its First Amended Complaint, which is identical in nearly every particular to the original complaint. The exact same allegations were made and the exact same relief was sought. There was, however, one notable addition. Annexed to the First Amended Complaint as Exhibit B, was a 147-page volume entitled, "Hogan & Hartson's Preliminary Response to the Report of Investigation by Special Counsel", which purported to answer the charges raised against plaintiff in the Report and correct certain factual errors and omissions. Defendant moved to dismiss this complaint. Before resolution of that motion, plaintiff moved for leave to file its proposed Amended and Supplemen-

---

1. For a brief review of the facts surrounding the *Vesco* cases, see *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974). As Chief Judge Kaufman noted in that case, "a mere glimpse into the multifarious financial manipulations of Robert Vesco reveals a web of corporate and personal transactions of astonishing intricacy." (At 1338). Fortunately, for our present purposes we need not attempt to recount those intricate transactions.

tal Complaint (Second Amended Complaint). Both motions have been fully briefed by the parties and are properly before us at this time.

## MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff's First Count alleges that Butowsky, as an officer and agent of this Court pursuant to the consent decree, has injured plaintiff's good name, reputation, business and property through the misrepresentations and material omissions contained in the Report. It is further alleged that Butowsky has "not, in fact, acted in an impartial and disinterested manner in the preparation of his Report." First Amended Complaint, ¶ 12. The thrust of plaintiff's argument in support of its First Count is that its Fifth Amendment right to due process has been violated in that Butowsky did not afford plaintiff the right to cross-examine witnesses against it or the right to present evidence on its own behalf.

As authority for this argument, plaintiff relies heavily on *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). *Jenkins* concerned the activities of the "Labor-Management Commission of Inquiry", a body set up by the State of Louisiana to investigate and find facts relating to violations of state or federal criminal laws in the field of labor-management relations. The Commission was appointed by and could act only upon referral from the Governor, when, "in his opinion, there is substantial indication that there are or may be 'widespread or continuing violations of existing criminal laws' affecting labor-management relations." *Id.* at 415, 89 S.Ct. at 1845. The scope of the Commission's investigatory powers was statutorily limited to criminal matters; the authority to investigate "strictly civil" matters was expressly withheld. *Id.* The Commission's purpose was to determine, through public findings,

"whether there is probable cause to believe violations of the criminal laws have occurred." *Id.* at 417, 89 S.Ct. at 1846. It was clear, however, that the powers and authority of the Commission did not extend to the rendering of binding adjudications with respect to any violations it discovered. The most it could do was "make such recommendations for action to the governor as it deems appropriate", report its findings to state or federal authorities, and file appropriate charges. *Id.* at 417, 89 S.Ct. at 1846. The findings were to be a matter of public record, but these findings would not constitute either prima facie or presumptive evidence of guilt or innocence in any court. *Id.*

The Commission was given the power to compel the attendance of witnesses, upon notice of the "general subject matter of the investigation." *Id.* While such a witness had the right to counsel, other rights, such as right to cross-examine other witnesses or the right to call witnesses to testify, were limited. Finally, where it appeared that testimony to be given "may tend to degrade, defame or incriminate any person" the Commission could, but was not required to, call an "executive session." *Id.* at 418, 89 S.Ct. at 1847.

Plaintiffs in *Jenkins* alleged, *inter alia,* "that the very purpose of the Commission is to find persons guilty of violating criminal laws without trial or procedural safeguards, and to publicize those findings" and further that the proceedings were "a concerted attempt publicly to brand him a criminal without a trial" in violation of their constitutional right to due process. *Id.* at 424–25, 89 S.Ct. at 1850. A three-judge District Court dismissed the complaint, holding that *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960),[2] foreclosed relief on the due process issue.

2. *Hannah* involved a challenge to procedures established by the Civil Rights Commission, which allegedly violated respondents' rights guaranteed by the Due Process Clause of the Fifth Amendment. The District Court held that the Commission was not authorized to adopt the Rules of Procedure in question and enjoined the Commission from holding any further hearings. The Supreme Court reversed, holding first that the procedures were authorized, and second that they did not violate the due process rights of respondents.

The Supreme Court (prevailing opinion by Justice Marshall in which the Chief Justice and Justice Brennan joined) reversed and remanded, holding that *Hannah,* relied on by appellees in *Jenkins,* was not controlling. 395 U.S. at 425, 89 S.Ct. 1851. The Court did, however reaffirm the decision in *Hannah, id.* at 427, 89 S.Ct. 1851, and it relied on the factors established by Chief Justice Warren in that case:

" '[d]ue process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account."

*Id.* at 426, 89 S.Ct. at 1851, *quoting,* 363 U.S. at 442, 80 S.Ct. 1514, 1515. The Court noted that the result in *Hannah,* the upholding of the Civil Rights Commission's procedures, was predicated on a finding that the Civil Rights Commission had a purely investigative and fact-finding function. Most importantly, it did not adjudicate or determine anyone's civil or criminal liability. The Court noted a significant distinction in the *Jenkins* case:

In our view, however, the Commission in the present case differs in a substantial respect from the Civil Rights Commission and the other examples cited by the Court in *Hannah.* It is true, as the Supreme Court of Louisiana has held . . that the Commission does not adjudicate in the sense that a court does, nor does the Commission conduct, strictly speaking, a criminal proceeding. Nevertheless, the Act, when analyzed in light of the allegations of the complaint, makes it clear that the Commission exercises a function very much akin to making an official adjudication of criminal culpability.

395 U.S. at 427, 89 S.Ct. at 1851–52. The Court went on to note that the Commission was "concerned only with exposing viola-tions of criminal laws by specific individuals" and that it "clearly exercises an accusatory function." *Id.* at 427–28, 89 S.Ct. at 1852. It also noted its agreement with Justice Frankfurter's concurrence in *Hannah* :

"Were the [Civil Rights] Commission exercising an accusatory function, were its duty to find that named individuals were responsible for wrongful deprivation of voting rights and to advertise such finding or to serve as part of the process of criminal prosecution, the rigorous protections relevant to criminal prosecutions might well be the controlling starting point for assessing the protection which the Commission's procedure provides."

*Id., quoting,* 363 U.S. at 488, 80 S.Ct. 1543. Finally, the Court's holding also relied to a great extent, if not exclusively, on the fact that the Commission in *Jenkins* investigated criminal matters:

"In the present context, where the Commission allegedly makes an actual finding that a specific individual is guilty of a crime, we think that due process requires the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights." *Cf. Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

*Id.* at 429, 89 S.Ct. at 1852.

█ In determining the applicability of *Jenkins* to the case at hand, it is important to bear in mind Chief Justice Warren's analysis in *Hannah, supra.* While due process is indeed an "elusive concept," it is at least clear that a more stringent standard of due process must be adhered to in criminal matters than in purely civil matters. This distinction has its foundation in the Bill of Rights which clearly calls for more safeguards when criminal proceedings are involved. *See e. g.,* Fifth Amendment: right against self incrimination, double jeopardy clause and requirement of Grand Jury indictment and presentment; Sixth Amendment: right to a speedy and public

trial, right to cross-examine witnesses, right of compulsory process for witnesses to testify in accused's favor, and the right to the assistance of counsel; *cf.* Seventh Amendment preserving only the right to a jury and the common law doctrines of *res judicata*/collateral estoppel in civil suits. When called upon to define the term "due process" in a given instance, the Court has often begun with an examination of the Bill of Rights:

> "The Fourteenth Amendment denies the States the power to 'deprive any person of life, liberty, or property, without due process of law.' In resolving conflicting claims concerning the meaning of this spacious language, the Court has looked increasingly to the Bill of Rights for guidance; many of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment."

*Duncan v. Louisiana*, 391 U.S. 145, 147–148, 88 S.Ct. 1444, 1446, 20 L.Ed.2d 461 (1968) (holding that the due process clause of the Fourteenth Amendment guarantees the right to a jury trial in state criminal cases). Thus it would not be surprising to find that the clear line established by the Bill of Rights between criminal and civil matters is similarly present in the "elusive concept" of due process.

Such a distinction is certainly consistent with Chief Justice Warren's articulation of factors to be considered in a determination of what due process requires in a given circumstance. As he stated in *Hannah*, both "[t]he nature of the alleged right involved, [and] the nature of the proceeding . . . must be taken into account." 363 U.S. at 442, 80 S.Ct. at 1515. There is no doubt that where the "alleged right involved" is one of liberty, as well as reputation, as in a criminal proceeding, and the "nature of the proceeding" is designed to determine a person's right to continued liberty, as in a criminal proceeding, then a higher standard of due process is mandated. Similarly, there is little doubt that where the rights involved and the nature of the

proceedings do not touch upon criminal matters, which have been singled out for special protection by the Bill of Rights, then a different standard of due process may be applicable. There lies the basis of the Court's holding in *Jenkins*; there too lies a basis for the Court's distinction between *Hannah* and *Jenkins*. In *Jenkins,* where the Commission exercised a "function very much akin to making an official adjudication of criminal culpability", 395 U.S. at 427, 89 S.Ct. at 1852; where the "alleged function . . . [was] to make specific findings of guilt, not merely to investigate and recommend", *id.,* 395 U.S. at 431, 89 S.Ct. at 1853, a standard of due process "very much akin" to that required in traditional criminal proceedings would be called for.

Plaintiff maintains that a standard of due process, similar to that required in *Jenkins,* should have been adhered to by defendant Butowsky in the preparation of his Report. Yet it is clear that neither the "alleged rights involved", nor the "nature of the proceeding" is at all similar to that in *Jenkins.* There is no allegation that plaintiff is being publicly branded as a criminal without a trial. There is no allegation that Butowsky's function is "very much akin to making an official adjudication of criminal culpability." Nor is there any showing that Butowsky's duty was to "determine, in public findings, whether there is probable cause to believe violations of criminal laws have occurred."

The *Jenkins* opinion is steeped in references to the criminal nature of the Commission's investigations, and the holding (*id.* at 429, 89 S.Ct. 1852, *supra*) is narrowly confined to the "context, where the Commission allegedly makes an actual finding that a specific individual is guilty of a crime." Such is not the case here, and the plaintiff's reliance on *Jenkins* is misplaced.

Plaintiff further contends that since Butowsky's Report received wide publicity, and in fact was intended from the outset to be distributed in public channels, some form

of due process would be required, namely the right to confront and cross-examine witnesses. Support for this proposition rests, according to plaintiff, on *Wisconsin v. Constantineau,*[3] 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) which states:

> "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."

*Id.* at 437, 91 S.Ct. at 510. Plaintiff's contention raises two problems. First, following the case of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), *Constantineau* is at best shaky ground on which to rest the proposition offered by plaintiff. Justice Rehnquist, in *Paul v. Davis,* substantially narrowed the language quoted above. According to this recent interpretation, the holding in *Constantineau* was predicated, not on the finding that Constantineau's "good name, reputation, honor, or integrity" was at stake, nor on a finding that she was "stigmatized," but rather because "the governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry." 424 U.S. at

708, 96 S.Ct. at 1164. Thus, under this interpretation, which we are bound to apply, plaintiff must allege some "right previously held" that was taken away by Butowsky. No such allegation is made.[4]

■ Second, under the language referred to above from *Constantineau,* even before its interpretation in *Paul v. Davis,* the only thing that would be required is "notice and an opportunity to be heard." There is no support in *Constantineau* for plaintiff's contention that this "opportunity to be heard" requires a "hearing at which the accused can confront and challenge the evidence against him, including the right to confront and cross-examine witnesses." Plaintiff's Memorandum, April 11, 1978 at 14. In the present circumstances, the "opportunity to be heard" may only require that which plaintiff has already received— an opportunity to read initial drafts, discuss matters with Butowsky and submit their own version of what happened as well as challenge pertinent aspects of the Report. An "opportunity to be heard" certainly does not mean that the investigator or fact-finder must believe or even include in his findings the submissions of all parties.[5] Due process varies with the right involved and the nature of the proceeding, and here we

---

3. Constantineau brought an action to declare a Wisconsin statute unconstitutional. The statute in question allowed a local police chief to post a notice in liquor stores forbidding the sale or gift of liquor to an individual "posted", if he determined that the individual "by excessive drinking" was exposing himself or family "to want", or becoming "dangerous to the peace" of the community. No provision was made for notice to the "posted" individual or an opportunity for her to defend herself.

4. *Paul v. Davis* may well bear on another aspect of the issue at hand. That case held that "the interest in reputation . . . is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." 424 U.S. at 712, 96 S.Ct. at 1166. While plaintiff also alleges damages to its employment interest because of Butowsky's actions, there is no allegation that plaintiff has a "claim of entitlement" to such employment as would be required before a "property" interest necessitating due process is found. *See: Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth,* 408 U.S.

564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sanderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Nor has plaintiff alleged any loss of present employment along with damage to reputation so as to require a due process hearing under *Huntley v. Community School Board of Brooklyn,* 543 F.2d 979 (2d Cir. 1976); or *Colaizzi v. Walker,* 542 F.2d 969 (7th Cir. 1976).

5. In its First Amended Complaint, plaintiff alleges "representatives of plaintiff Hogan & Hartson offered to Butowsky under certain conditions an opportunity to include with his Report a Response to be prepared on behalf of Hogan & Hartson pointing out some of the misrepresentations, material omissions and other inaccuracies in the proposed Report as it relates to plaintiff. . . . Said offer was refused by Butowsky." (at ¶ 14).

This Response was annexed to the First Amended Complaint as Exhibit B, and, as we noted above, this addition was the only significant "amendment" to the original complaint.

believe plaintiff has received all the process that was due.[6]

The prospect of widespread publicity was also present in *Hannah v. Larche, supra,* but even so the Supreme Court found no infringement of due process. (*See*: note 2, *supra.*) In *Hannah,* the investigatory procedures set up by the Civil Rights Commission were challenged both as outside the authority granted the Commission by Congress, and as violative of due process. These procedures were challenged during the Commission's "investigation of alleged Negro voting deprivations in the State of Louisiana" 363 U.S. at 421, 80 S.Ct. at 1504. The Commission had summoned both registrars of voters and private citizens to appear before a hearing. The specific rules challenged provided that the identity of persons submitting complaints to the Commission may be withheld, and that those called to testify before the Commission may not cross-examine other witnesses.

The Court first held that the procedures complained of were within the authorization granted by Congress. It then addressed the due process challenge. After noting that the requirements of due process vary with the type of proceeding involved, the Court defined the function of the Commission:

> "[I]ts function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action."

*Id.* at 441, 80 S.Ct. at 1514. After stating the factors to be considered in a determination of what the concept of due process requires in a given instance (*see* discussion of *Jenkins, supra*), Chief Justice Warren noted that there are significant differences between an adjudicatory proceeding and an investigative one. He then continued:

> "It is probably sufficient merely to indicate that the rights claimed by respondents are normally associated only with adjudicatory proceedings, and that since the Commission does not adjudicate it need not be bound by adjudicatory procedures. Yet, the respondents contend and the court below implied, that such procedures are required since the Commission's proceedings might irreparably harm those being investigated by subjecting them to public opprobrium and scorn, the distinct likelihood of losing their jobs, and the possibility of criminal prosecutions. . . . However, even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function."

*Id.* at 442–43, 80 S.Ct. at 1515.

A similar result is called for in the present case. If any of the alleged harms are actually suffered by plaintiff—that is damage to their reputation, loss of future employment and exposure to civil liability—they are just as much "collateral consequences" as the harms complained of in *Hannah.* This is not a case where the actions of an investigative or adjudicative body remove an individual from present employment or prevent him from holding a particular type of job. *Cf. Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), where individuals would be deprived of government employment after being branded Communists; *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d

---

**6.** It seems clear that all hearings need not provide an opportunity to cross-examine witnesses or confront and challenge adverse evidence. *See e. g., United States v. Florida East Coast*

Ry., 410 U.S. 224, 240–241, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *American Telephone & Telegraph Co. v. F.C.C.,* 572 F.2d 17, 21–23 (2d Cir. 1978).

1230 (1961), where discharge of an employee of a government contractor resulted from being charged with disloyalty. The injuries complained of here "are sanctions applied by public disapproval, not by law." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 184, 71 S.Ct. at 655. (Jackson, J., concurring). Nothing Butowsky has done will, of its own force, foreclose plaintiff from any area of employment; if it is in fact foreclosed (which in any event is not alleged), it is the decision of its clients or prospective clients. Thus the nature of the proceeding and the right involved do not require the standard of due process for which plaintiff contends.

In the present case, it is clear that Butowsky does not adjudicate. Nor does he hold trials or determine anyone's civil or criminal liability, though he may bring civil actions. Obviously he does not indict or punish or impose legal sanctions. While Butowsky's function is not to find facts to be used as a basis for legislative action, we do not feel that this distinction is enough to make the holding of *Hannah* inapposite; certainly it is not enough to warrant the more stringent requirements called for in *Jenkins.*

Finally, there is yet another reason for rejecting plaintiff's due process claim. Chief Justice Warren articulated a third factor to be considered in a due process determination: "the possible burden on [the] proceeding" 363 U.S. at 442, 80 S.Ct. at 1515. As he noted, "the investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings . . . ." *Id.* at 443, 80 S.Ct. at 1515. Among the various government agencies whose investigative procedures were expressly approved in *Hannah* was the SEC, "even though the Commission is required to initiate civil or criminal proceedings if an investigation discloses violations of law." *Id.* at 447–48, 80 S.Ct. at 1517–18. Certainly Butowsky's investigatory powers were not nearly as far

reaching as the SEC's. He cannot, for example, initiate criminal proceedings, nor does he have the power to subpoena witnesses to testify. But as with the SEC, Butowsky's investigation would have been "completely disrupted" if he were required to adhere to plaintiff's urged standard of due process at every turn. As it was, the Report took four and one half years to complete. If Butowsky, in addition to unravelling transactions of "astonishing intricacy," was required to afford plaintiff, and all others in a similar posture, an adversary hearing on each fact found and conclusion reached, it is quite probable that the task of preparing the Report would have consumed a much longer period of time. Extensive delays could well have caused lawsuits either on behalf of or against ICC to be barred by the Statute of Limitations or laches. Moreover, other problems associated with delay could have arisen, such as witness unavailability or failure of accurate recollection.

And finally, it should be noted that plaintiff has not been denied a day in court on the allegations raised by the Report. It is currently a defendant in three parallel lawsuits by ICC in which the allegations of ICC echo the assertions of Butowsky in the Report.[7] Accordingly, Hogan & Hartson will have full opportunity, amidst the complete panoply of due process, to confront and controvert these assertions in those lawsuits. What plaintiff claims was required, in addition to the hearings provided by these lawsuits, was another adversary proceeding prior to the publication of the Report. We hold that due process does not require such a result. If the nature of the investigation by Butowsky called for any of the traditional due process requirements, plaintiff received them—notice, and an opportunity to review drafts of the Report and make its own submissions for consideration by Butowsky.

Since there are no disputed factual issues, it is appropriate to dismiss plaintiff's First

---

7. *See: International Controls Corp. v. Hogan & Hartson and Merle Thorpe, Jr.,* 77 Civ. 5764 (RJW) (S.D.N.Y.); *International Controls Corp. v. Hogan & Hartson and Merle Thorpe, Jr.,* Civil No. 77–2369 (D.C.N.J.); and *International Controls Corp. v. Hogan & Hartson, et al.,* CA 11848–77 (Superior Court of the District of Columbia).

Count for failure to state a claim upon which relief can be granted, even if we assume all of plaintiff's factual allegations to be true, as we must. We so hold.

Plaintiff also raises a Second Count. As best we understand this rather obscure claim, plaintiff contends that Butowsky's Report is outside the authorization of the consent decree because the consent decree cannot be interpreted so as to permit Butowsky to violate the due process rights of plaintiff. Plaintiff's Memorandum, November, 1977 at 28. Obviously, by holding that the due process rights of plaintiff were not violated, as we do, we dispose of this count as well. The Second Count is likewise dismissed for failure to state a claim upon which relief can be granted.

## DEFENDANT'S REQUEST FOR REASONABLE ATTORNEYS' FEES

Defendant Butowsky has argued that he is entitled to reasonable attorneys' fees because plaintiff's "action is frivolous," "[p]laintiff's claims are totally without merit as indicated by Supreme Court decisions directly on point," and "this action falls within [the] boundaries of bad faith." Defendant's Memorandum, March 10, 1978 at 12–13. Defendant cites *Browning Debenture Holders' Committee v. DASA*, 560 F.2d 1078 (2d Cir. 1977) as support for his "bad faith" claim. As stated in that case:

> "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons. Otherwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court."

560 F.2d at 1088.

█ We hold that plaintiff's claim is not "entirely without color." Nor are we convinced that this action was brought "wantonly, for purposes of harassment or delay, or for other improper reasons."[8] Plaintiff

has a real interest which is being affected by the Report of Butowsky. Whether this interest is sufficient to require a certain standard of due process is a proper subject for litigation. When even the Chief Justice of the United States Supreme Court recognizes due process to be an "elusive concept," *Hannah, supra*, 363 U.S. at 442, 80 S.Ct. 1515, we are hesitant to hold that no "colorable" claim has been made. Finally, if as defendant claims, there are "Supreme Court decisions directly on point," we can only ask why he failed to cite them. Certainly no case is cited, Supreme Court or otherwise, which defines the due process rights of persons to be investigated by court-appointed Special Counsel. Neither *Hannah*, nor *Jenkins* are "directly on point."

The motion to dismiss the First and Second Counts of the First Amended Complaint is granted. Defendant's request for attorneys' fees is denied. Decision on the motion to amend and supplement the complaint is reserved.

SO ORDERED.

---

8. Though there may be merit to defendant's contention that the First Amended Complaint was filed "solely for the purpose of enabling Hogan & Hartson to file a rebuttal to the Report as an exhibit [B] and to disseminate it to the press under a claim of privilege," Reply Memorandum, April 17, 1978, we are not persuaded that such an action would warrant the unusual remedy of an award of attorneys' fees where no other improper reasons are found.