**Lionel THOMAS, and Hazel Thomas, Plaintiffs,**

v.

**ROSS & HARDIES, and Phoenix Financial Services, Inc., Defendants.**

No. Civ.A. AW–97–2284.

United States District Court, D. Maryland.

June 10, 1998.

Julian Karpoff, Arlington, VA, for Plaintiffs.

Jacob A. Stein, Washington, DC, for Defendant Ross & Hardies.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

This case involves a complaint by homeowners who believe they were victimized by a scheme involving the diversion of mortgage proceeds. Currently pending before the Court is a motion to dismiss the second amended complaint filed by Defendant Ross & Hardies, a partnership law firm. A hearing was held in open court on November 24, 1997, and supplemental briefs were requested by the Court and received on May 1, 1998. For the reasons set forth below, the Court will deny Defendant's Motion.

### Factual Background

"In considering a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiffs, and its allegations taken as true." *Finlator v. Powers,* 902 F.2d 1158, 1160 (4th Cir.1990) (citing *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)). A summary of the factual allegations set forth by the second amended complaint ("complaint") is as follows.

Plaintiffs are individual residents of Maryland, and bring this suit against Ross & Hardies, a partnership law firm, and Phoenix Financial Services, Inc. ("Phoenix"), a mortgage brokerage business. The complaint largely concerns the involvement of an attorney named Steven P. Kersner ("Kersner") in a financial program called the "7.5% Program." At all times relevant to the Complaint, Kersner was a partner at Ross & Hardies.

In the fall of 1994, Kersner and Ross & Hardies were retained by a man named Michael Clott ("Clott"). Clott previously was convicted of RICO violations, transportation of stolen securities, and bank and mail fraud. Clott was released from prison on supervised release in May 1994, a few months before he retained Kersner and Ross & Hardies. Part of Clott's supervised release was a consent order whereby he agreed not to engage in the financial securities business in Maryland. Clott retained Kersner and Ross & Hardies to provide Clott's company, Capital Financial Group, Inc. ("Capital"), a legal framework in which Clott could conduct business in the

finance, securities, mortgage, and investment banking industries in Maryland.

In September 1994 Clott, acting through Capital, began a business relationship with Defendant Phoenix, which was in the mortgage brokerage business. Clott persuaded Phoenix and its owner and founder, Shirley Binion ("Binion"), to assist Clott in marketing his 7.5% Program ("Program") and to participate in the Program. Clott told Binion that the 7.5% Program worked as follows: Binion would help Clott solicit minority homeowners for the Program. The homeowners would mortgage their homes from third party mortgage companies for the maximum amount possible. The homeowners would then turn the proceeds of the mortgages over to Phoenix and Phoenix would then either pay off each mortgage in full or would purchase it from the mortgage company. In exchange for doing this, Phoenix would grant the homeowners a line of credit with a 7.5% interest rate. The rate would stay at 7.5% regardless of increases in the prevailing market rate. The homeowners were free to access the line of credit as frequently or infrequently as they wished, and could choose to never utilize it at all.

The gravamen of the complaint is that the 7.5% Program was a fraud. While homeowners did take out mortgages and turned proceeds over to Phoenix, the money was never used to pay off the mortgages and the homeowners never had access to lines of credit. Instead, the complaint alleges that Clott diverted the money and the homeowners were left with significant mortgages on their property. The scheme fell apart sometime during the summer of 1995, and both Clott and Kersner pled guilty to felony charges brought by the United States Attorney's office. Counsel informed the Court during oral argument that the two were confined to jail at least as of the date of oral argument.

Most relevant to the pending motion are the allegations as to the involvement of Kersner and Ross & Hardies. According to the complaint, Kersner was active in directing the operation of the Program, and allegedly played a key role in lending it credibility. He spoke with Binion early on, assuring her that he would "check, approve, and 'okay' everything that Clott advised her to do, so she would not have to be concerned about the appropriateness and legality of any transaction he suggested." Sec.Am.Compl. ¶ 12. Once the scheme began, the complaint alleges that Kersner led Binion to believe that he and Ross & Hardies were providing Phoenix with legal representation concerning the operation of the Program, that this belief was essential in Binion's marketing of the Program, and that Kersner represented to some of the homeowners that he represented Phoenix. Sec.Am.Compl. ¶¶ 15–16.

The Complaint alleges other aspects of Kersner's and Ross & Hardies's involvement. For example, Kersner allegedly helped "pitch" the Program to legitimate mortgage lenders as early as December 1994, and allowed Clott to use the Ross & Hardies office in Washington, D.C. to conduct Capital's business. Sec.Am.Compl. ¶ 17. Other attorneys at Ross & Hardies allegedly drafted consulting agreements that would allow Clott to advise Phoenix without violating his consent order. Ross & Hardies attorneys are accused of helping Clott defend a parol violation investigation that was conducted by Maryland authorities. *Id.* For example, Kersner and John Fornaciaria ("Fornaciaria"), another Ross & Hardies partner, allegedly prepared paperwork and affidavits for Phoenix principals and Clott himself, all falsely representing the nature of Clott's involvement with Phoenix. Sec.Am.Compl. ¶¶ 26(a), (b). In fact, Fornaciaria is alleged to have visited Clott in jail and drafted affidavits for Clott exculpating the law firm. Sec.Am. Compl. ¶ 28. Kersner allegedly wrote false letters on Ross & Hardies letterhead concerning Clott's sentencing. Sec.Am.Compl. ¶ 18A. These acts were done even though Ross & Hardies attorneys, specifically Kersner and Fornaciaria, knew that they were misleading as to Clott's involvement in the business and that Clott's activities were fraudulent in nature. Sec.Am.Compl. ¶¶ 26(b), 29.

The Complaint also alleges that Kersner played a key role in perpetuating the scheme by meeting and assuring the victim homeowners. For example, Kersner helped re-

solve a problem that arose when Clott "whited-out" a limited endorsement on a check from a cautious homeowner. Sec.Am.Compl. ¶ 19. Homeowners who were potential Program participants met with Kersner in Ross & Hardies's D.C. office and talked with him by phone, during which time Kersner assured them that the Program was legitimate and had Ross & Hardies's backing. Sec.Am. Compl. ¶¶ 20–22.

In addition, the complaint states that Kersner aided Clott in fraudulently transferring the loan proceeds to various bank accounts, opening empty accounts in the names of the participants to deceive them into believing that lines of credit had been established, preparing false documents to make it appear that the mortgages had been paid off, making monthly payments on some of the mortgages to conceal the fact that they had not been paid in full, telling lenders to contact Kersner with questions and not call the homeowners, and forging and altering certain checks. Sec.Am.Compl. ¶ 30.

The complaint contains six counts. Count VI alleges a RICO violation, whereas Counts I through V allege state law claims for aiding and abetting fraud, aiding and abetting negligent misrepresentation, aiding and abetting conversion, negligent misrepresentation, and partnership liability.

*Analysis*

I. *Motion to Dismiss*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may only be granted if the non-movant cannot prove any set of facts that would entitle her to relief. *See Labram v. Havel,* 43 F.3d 918, 920 (4th Cir. 1995) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). It bears repeating that "[i]n considering a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiffs, and its allegations taken as true." *Finlator v. Powers,* 902 F.2d 1158, 1160 (4th Cir.1990) (citing *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)). Some materials outside of the pleadings have been submitted, but the Court has not considered them in its decision and therefore has not converted Defendants'

motion into one for summary judgment. Rule 9(b) requires that plaintiffs plead fraud claims with particularity.

II. *The RICO Claim*

RICO's civil remedies section, 18 U.S.C. § 1964(c), provides a private cause of action for persons injured by a violation of § 1962. Although the complaint is not clear in relying on a specific section, it is evident from the briefs and oral argument that Plaintiffs allege a violation of § 1962(c). Section 1962(c) makes it unlawful for:

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The elements of a § 1962(c) violation are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985) (footnote omitted). Defendant argues that the complaint should be dismissed because it fails to allege sufficient facts to prove two of the elements of a § 1962(c) violation: A pattern of racketeering activity, and that Defendants conducted or participated in the affairs of the enterprise. In addition, Defendant argues Plaintiffs have not plead a RICO injury under § 1964(c).

A. *Pattern of Racketeering Activity*

To state a claim for a violation of § 1962(c), a plaintiff must allege a pattern of racketeering activity. *See Brubaker v. City of Richmond,* 943 F.2d 1363, 1374 (4th Cir. 1991). Section 1961(1) defines "racketeering activity" as an act chargeable under any of the individual state and federal crimes listed in § 1961(1). To have a *"pattern* of racketeering activity" there must be at least two acts of racketeering activity. 18 U.S.C. § 1961(5) (emphasis added). The Supreme Court explained that while two acts are the minimum requirement, two acts often are insufficient because "two of anything do not

generally form a 'pattern.'" *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. 3292 n. 14.

■ The Supreme Court most clearly explained the pattern requirement in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The key to establishing a pattern of predicate acts is not the number of acts; rather, it is the relationship the acts bear to each other or to an external principle, plus the "'threat of continuing activity.'" *See id.* 492 U.S. at 238, 239, 109 S.Ct. 2893 (quoting Senate report). The need for at least a threat of continuing activity is important because "Congress was concerned in RICO with long-term criminal conduct." *See id.* 492 U.S. at 242, 109 S.Ct. 2893. The Court envisioned two different types of conduct that would satisfy the continuity requirement, one in which the acts occurred during a closed but extended period of time, and another in which the acts by their nature projected a threat of future repetition. *See id.* 492 U.S. at 241, 109 S.Ct. 2893.

■ Defendant argues that the facts alleged by the complaint occurred over too a short period of time to satisfy the continuing threat requirement.[1] Defendant argues that the predicate acts as alleged in the complaint are various acts of mail and wire fraud and monetary transactions in property derived from unlawful activity. Plaintiffs have not challenged this conclusion. Paragraph 34 of the complaint states that the alleged racketeering activity continued over a nine month period.

Defendant largely relies upon three Fourth Circuit cases in which the Court found the length of time alleged was insufficient to suggest a threat of future activity. In *Parcoil Corp. v. NOWSCO Well Service, Ltd.,* 887 F.2d 502 (4th Cir.1989), two companies hired to drill oil wells falsified seventeen reports over a four month period concerning the type of sand they used. The Court found

that this was not a sufficient allegation of continuity to satisfy the standard set forth in *H.J. Inc.* In *Eastern Pub. and Advertising Inc. v. Chesapeake Pub. and Advertising, Inc.,* 895 F.2d 971 (4th Cir.), *cert. denied,* 497 U.S. 1025, 110 S.Ct. 3274, 111 L.Ed.2d 784 and 498 U.S. 819, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990), one newspaper claimed that a second newspaper had violated its copyrights and exploited its customers. The scheme involved lasted only three months, and the Court affirmed the dismissal of the case. *Menasco Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989), involved a number of investors who sued their partners, alleging deceit and misrepresentations in the formation of oil companies. The Fourth Circuit found that the acts took place during a single year and that there were no ongoing activities that posed a continuing threat, and ordered the District Court to grant the plaintiffs an opportunity to amend their complaint.

These cases are all distinguishable for the same reason—each involved a scheme with a limited purpose which terminated upon the achievement of a limited goal. In *Parcoil,* the scheme ended once the wells had been drilled. In *Eastern Pub.,* the Court found that the scheme was a "'single, non-recurring scheme to defraud a single entity'" in a narrow business context. *Eastern Pub.,* 895 F.2d at 972 (quoting prior decision); 831 F.2d 488, 492 (4th. Cir.1987). The scheme was "brought to fruition" within three months once the "limited purpose" was accomplished. *See Eastern Pub.,* 895 F.2d at 973. Similarly, *Menasco* involved acts that were "narrowly directed towards a single fraudulent goal" and the "limited purpose" of defrauding two parties of specific oil interests. *See Menasco,* 886 F.2d at 684.

■ Whether certain acts pose a threat of continued activity "'depend on the specific facts of each case.'" *Menasco,* 886 F.2d at

---

1. The parties disagree as to whether the scheme alleged in the complaint is "closed-ended" or "open-ended." The complaint, ¶ 34, states that the scheme was "closed-ended," but there was some discussion during oral argument and in the briefs as to whether that assertion is correct. *See* Pls.' Opp. to Def.'s Mot. to Dismiss Sec.Am. Compl. at 10; Def.'s Supp.Mem. in Supp. of Mot. to Dismiss Pls.' Sec.Am.Compl. at 2. For the purpose of this motion, the Court will construe the facts in a light most favorable to Plaintiffs, and will focus on the facts alleged in the complaint and not the labels attached to those facts. In this case, the scheme alleged by the complaint was open-ended.

684 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893). In the case *sub judice*, the scheme alleged by the complaint was not self-terminating and did not have a finite goal. There is no reason to believe Kersner and Clott had a fixed number of victims in mind for the broad, open-ended scheme. Instead, the facts alleged by the complaint strongly suggest that Kersner and Clott would have continued to defraud homeowners for as long as they could. *See United States v. Grubb*, 11 F.3d 426, 440 (4th Cir. 1993) (illegal activity likely to continue as long as defendant remained in office). Unlike the cases cited above, the scheme ended not because a limited goal had been accomplished, but because the perpetrators were caught and prosecuted.[2] Defendant's argument that the scheme posed no long-term threat because it necessarily unraveled upon attempts by the homeowners to draw on their lines of credit is unpersuasive. The Court cannot conclude at this point that the scheme was inevitably doomed to fail in a short period of time, and the fact that Kersner and Clott were destined to be caught at some point does not change the nature of the scheme. Although the acts occurred over a brief period, their relationship to the external, organizing principle of recruiting and defrauding homeowners strongly suggests a long-term scheme that posed a serious threat of continuation. Plaintiffs have alleged facts sufficient to satisfy the pattern requirement of § 1962(c).

**B. Conduct the Affairs of the Enterprise**

▆ Section 1962(c) only imposes liability on those who "conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity." In *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court authorized the "operation or management" test for § 1962(c). *Reves* resolved the question of how much control of the enterprise's activity is necessary, holding that "one must have some part in directing" the affairs of the

enterprise. *See id.* 507 U.S. at 179, 507 U.S. 170. Mere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise.

▆ The operation of an enterprise is not limited to upper management and those under upper management's direction. Outsiders who exert control over the enterprise may also be liable. *See id.* 507 U.S. at 184, 113 S.Ct. 1163. In *Reves* the Court used the example of an outsider who exerts control over an enterprise through the use of bribery. *Id.* The Court concluded that an accounting firm had not satisfied the test, *see id.* 507 U.S. at 186, 113 S.Ct. 1163, even though the most favorable view of the evidence was that the firm had created financial statements it was hired to audit and took the responsibility of deciding how to value the client's most valuable asset. *See id.* 507 U.S. at 189–90, 113 S.Ct. 1163 (Souter, J., dissenting).

Since *Reves,* a number of Courts have dismissed complaints and granted summary judgment in favor of professionals, such as lawyers and accountants, whose professional services were essential to an enterprise yet did not participate in the direction, operation, or management of the enterprise. *See, e.g., Nolte v. Pearson,* 994 F.2d 1311 (8th Cir. 1993) (music company's law firm which prepared information regarding tax law for investors did not participate in operation or control of enterprise); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248 (S.D.N.Y.1997) (granting summary judgment where accounting firm allegedly made misrepresentations in financial statements relied upon by investors).

▆ Courts have recognized, however, that *Reves* did not establish a *per se* rule that one cannot operate or manage an enterprise via the provision of legal services. *See In re American Honda Motor Co., Inc. Dealerships Relations Litigation,* 941 F.Supp. 528, 559–60 (D.Md.1996). A person may violate

---

2. The parties discussed the recidivist inclinations of Kersner and Clott, debating whether there is *still* a threat of continued activity. Surely this is not required. The mere fact that the perpetra-

tors of a RICO scheme are caught early in the scheme should not bar a civil suit when the nature of the acts suggests a threat of continuation.

§ 1962(c) if he conducts the affairs of an enterprise, even though he does so through the provision of professional services. Because of the supportive nature of professional services, it is most often the case that lawyers and accountants do not conduct an enterprise's affairs. Nevertheless, there are situations in which the professional services provided strike at the very core of the enterprise and therefore the lawyer or accountant providing the services is managing or operating the firm. *See, e.g., Napoli v. United States,* 32 F.3d 31 (2d Cir.1994) (where enterprise was law firm, lawyers participated in core activities of trying cases and obtaining settlements), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *Tribune Co. v. Purcigliotti,* 869 F.Supp. 1076, 1098 (S.D.N.Y.1994) (denying motion to dismiss where lawyers allegedly helped devise scheme and directed others to act to further scheme of filing false claims), *aff'd sub nom. Tribune Co. v. Abiola,* 66 F.3d 12 (2d Cir. 1995).

 This is not a case in which the scheme was a mass filing of lawsuits and in which the lawyers who decided who to sue and how to handle the litigation obviously operated or managed the firm. The complaint alleges that Clott's firm Capital, a Ross and Hardies client, was the enterprise. As alleged by the complaint, Capital and Phoenix were in the business of persuading homeowners to obtain mortgages, receiving mortgage proceeds from the homeowners, transferring the mortgage proceeds to various accounts, and providing lines of credit to the homeowners. Kersner allegedly persuaded homeowners to obtain mortgages and give the proceeds to Capital, placated the mortgage companies who demanded payment, transferred proceeds between accounts, and established lines of credit for homeowners. These activities strike at the heart of Capital's alleged activities. If it is true that Kersner directed and controlled these essential activities of the enterprise then Kersner conducted, operated, and managed the enterprise in satisfaction of the standard established for § 1962(c) violations.

If the allegations of the complaint are true then this ruling allowing liability is not inconsistent with RICO's purpose as discussed by the Supreme Court. In *Reves,* the Court noted that there were concerns in Congress that the definition of racketeering activity was far too broad. *Reves,* 507 U.S. at 183, 113 S.Ct. 1163. The Court cited the explanation of Senator McClellan, who assured his colleagues that liability would not attach unless an individual not only engaged in a pattern of racketeering activity, but also used that pattern to operate an interstate business. *Id.* (citing 116 Cong.Rec. at 18940). Here, the complaint alleges that Kersner not only engaged in a pattern of wire fraud and illegal monetary transfers, but that he did so to help control and direct the conduct of Capital. This allegation of a potentially long-term scheme of running a business through a pattern of racketeering activity falls squarely within the confines of the behavior prohibited by RICO.

The Court is considering a motion to dismiss, and Plaintiffs are far from establishing that these were the core activities of the firm or that Kersner actually did these acts. For example, Defendant argues that all of the alleged predicate acts were committed by Phoenix, and that even if he controlled Capital Kersner could not have directed the scheme. This is a factual dispute that cannot be resolved in a motion to dismiss. The Court merely finds that the allegations set forth by the complaint sufficiently suggest that there exists a set of facts that would entitle the Plaintiffs to relief.

### C. *Partnership Liability under RICO*

A difficult question facing the Court is whether there is partnership liability under RICO. Originally, the parties only briefed the issue of partnership liability in the context of the state law claim. Because this is an important topic worthy of discussion in the context of the RICO claim, the Court requested and received supplemental briefs from both sides.

As discussed throughout this opinion, the Court has concluded that the facts set forth by the complaint are sufficient to state a claim against Kersner for RICO violations. Kersner, however, is not a defendant to this action. Instead, it is his former law firm,

Ross and Hardies, that Plaintiffs chose to sue. The Court must determine whether Plaintiffs can state a claim against a partnership law firm for the alleged RICO violations of one of the partnership's members. The Court's primary concern is that it not allow a plaintiff to use partnership liability to reach a party that Congress did not wish to hold liable under RICO. See Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1306 (7th Cir.1987) (discussing two part test requiring that corporation benefited from acts and that liability would not violate congressional intent), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); see also Petro–Tech Inc. v. Western Co. of North America, 824 F.2d 1349, 1358 (3d Cir.1987) (holding that respondeat superior may be applied to RICO claims where structure of RICO does not otherwise forbid it); Brady v. Dairy Fresh Prods. Co., 974 F.2d 1149, 1153 (9th Cir.1992) (adopting rule from Petro–Tech).

■■■■ Under basic agency law, a principal is liable for torts committed by its agent if the agent acts with apparent authority. See American Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 565–66, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). This is true even if the agent's act of fraud is committed solely to benefit the agent. See id. 456 U.S. at 566, 102 S.Ct. 1935. The general rule of partnership liability is that a partner is an agent for the partnership, and a partnership is liable for the wrongful acts of its partners committed in the ordinary course of the business of the partnership. See Revised Uniform Partnership Act §§ 301, 305 (1994); Md.Code Ann. Corps. & Ass'ns § 9–305 (Supp.1997); see also 59A Am.Jur.2d Partnership § 650 (1987). With fraud claims, it is especially appropriate to hold a partnership liable when it benefited from the fraudulent acts of its partner. See 59A Am.Jr.2d Partnership § 670.

■■■■ Turning to RICO, it is well-settled that Congress's intent was that § 1962(c) be used to punish individuals who conduct the affairs of a business through a pattern of racketeering activity, and that § 1962(c) is not targeted at the businesses that are innocent victims of racketeering activity. See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132, 140 (D.C.Cir.1989), rev'd in part on other grounds, 913 F.2d 948 (D.C.Cir.1990) (en banc), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Nevertheless, the Supreme Court has said that RICO's civil provisions must be construed broadly in order to enforce RICO's remedial purposes. See Sedima, 473 U.S. at 497–98, 105 S.Ct. 3292.

■■■ A number of Courts have held that vicarious liability, a doctrine related to partnership liability, is inconsistent with the express terms of § 1962(c). See, e.g., Landry v. Air Line Pilots Ass'n Int'l, 901 F.2d 404, 425 (5th Cir.), cert. denied, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); Yellow Bus Lines, 883 F.2d 132; Liquid Air Corp., 834 F.2d at 1306; Schofield v. First Commodity Corp., 793 F.2d 28, 30–32 (1st Cir. 1986). These cases, however, all involved the "non-identity" rule. This rule requires that the defendant to a RICO suit must be a different entity than the "enterprise" plead under § 1962(c). This requirement stems from the statute's language, which distinguishes the "person" who is employed by or associated with the "enterprise," from the "enterprise" itself. See Busby v. Crown Supply, Inc., 896 F.2d 833, 840 (4th Cir. 1990). It is the "person," and not the "enterprise," that is subject to RICO liability. These cases denying vicarious liability have been distinguished by subsequent courts in light of their specific concern about the non-identity rule. See Crowe v. Henry, 43 F.3d 198, 206 n. 19 (5th Cir.1995) (discussing Landry); Cox v. Admin. U.S. Steel & Carnegie, 17 F.3d 1386, 1404–06, modified by 30 F.3d 1347 (11th Cir.1994), cert. denied, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); Davis v. Mutual Life Ins. Co., 6 F.3d 367, 379–80 (6th Cir.1993),[3] cert. denied, 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); 131 Main St. Assocs. v. Manko, 897 F.Supp. 1507, 1534 (S.D.N.Y.1995) ("But the resolu-

---

**3.** In addition, the Sixth Circuit distinguished Luthi v. Tonka Corp., 815 F.2d 1229, 1230 (8th Cir.1987) because it involved an enterprise that was the victim of the RICO activity. See Davis, 6 F.3d at 379.

tion of the issue of vicarious liability in these cases was intimately bound up with the holding that ... a corporation may not be named as both a defendant 'person' and as the RICO 'enterprise.' ").

Because Ross & Hardies is the defendant in this case and Capital is the enterprise, the non-identity rule is not an issue and the Court need not worry that an innocent firm overrun by RICO activity might be held liable under § 1962(c). In similar cases in which the non-identity rule was not at issue (where the "enterprise" and "person" were different entities), courts have ruled in favor of vicarious liability. In *Brady*, 974 F.2d at 1154–55, the Ninth Circuit held that an employer may be held liable under agency principles when it benefits from violations of § 1962(c) and is distinct from the enterprise. The court found that this rule would further both RICO's compensatory goal and deterrence goal. *Id.* at 1155. The Eleventh Circuit similarly allowed vicarious liability under § 1962(c) because that circuit does not follow the non-identity rule, although it added that it would allow vicarious liability even if it did follow the non-identity rule. *See Cox*, 17 F.3d at 1406. The court chose to protect firms that are innocent victims of RICO violations by requiring that the acts be committed within the scope of employment, be in furtherance of the firm's business, and be authorized or subsequently acquiesced by the firm. *See id.* at 1406–07. *See also Petro–Tech*, 824 F.2d at 1361–62 (for counts in which defendant was not RICO enterprise, "theories of respondeat superior and aiding and abetting liability are not out of place"). *But see Aspacher v. Kretz*, 1997 WL 692943 at *12 (N.D.Ill. Aug.13, 1997) (granting summary judgment where defendant corporation did not encourage or know about false assurance giving rise to RICO claim).

■ The Court agrees with the reasoning of the courts that have allowed vicarious liability, such as the Ninth Circuit in *Brady*, and finds that imposing partnership liability under § 1962(c) does not violate congressional intent. One must separate the concept of

what constitutes a violation of § 1962(c) from which parties may be held liable under § 1964(c) once a § 1962(c) violation has been established. It is appropriate for a court to assume that traditional rules of agency law apply to a federal statute's civil liability provision when those traditional rules are consistent with the statute's purpose and when Congress has not indicated otherwise. *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1083 (D.Del.1984). *See also Schofield*, 793 F.2d at 33 (extent to which statute incorporates common law principles of agency liability depends on the extent to which the principles are consistent with the statute's language and purposes).

The Supreme Court's analysis in *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) is instructive. The Court held that traditional agency rules of apparent authority apply to the antitrust laws and that an organization may be held liable for the antitrust violations of an agent who acts with apparent authority, even if the acts were not committed to benefit the principal. *Id.* 456 U.S. at 567–68, 570, 102 S.Ct. 1935. The Court found that an important purpose of the private cause of action created by the antitrust laws is the deterrence of anticompetitive behavior. *Id.* 456 U.S. at 572, 102 S.Ct. 1935. That purpose is well-served when a principal is held liable for the antitrust violations of its agent because it gives the principal a "powerful incentive" to prevent future antitrust violations. *Id.* The Court was not influenced by the Sherman Act's imposition of treble damages, *see id.* 456 U.S. at 574–76, 102 S.Ct. 1935, a feature shared by RICO. The comparison to the analysis in *American Soc. of Mech. Engineers* is especially appropriate because RICO's civil liability section, § 1964(c), was modeled on 15 U.S.C. § 15, the very antitrust civil action provision at issue in *American Soc. of Mech. Engineers. See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).[4]

---

4. The Court's reasoning in *Holmes* is not completely decisive because the Court did not interpret the antitrust statute as including agency liability until after RICO was enacted. Moreover, the mere borrowing of the antitrust language does not necessarily indicate an intention

Holding a partnership liable for the RICO violations of its partner under doctrines of agency and partnership liability serves Congress's goal of deterring individuals from controlling organizations through a pattern of racketeering activity. The Court also agrees with the Ninth Circuit in its holding that imposing liability under vicarious liability (or in this case partnership liability) is consistent with RICO's compensatory goal. *See Brady,* 974 F.2d at 1154–55. Holding a partnership liable when it benefits from the acts of its partners will prevent the partnership from being unjustly enriched and will help serve Congress's goal of compensating victims of racketeering activities. This holding is consistent with that of at least one other Judge in this district, *see Mylan Labs., Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1069–70 (D.Md.1991) (Ramsey, J.), and other scholarly opinions. *See* Denise Cote, Vicarious Liability Under Civil RICO, 155 Practicing Law Institute/Litigation and Administrative Practice Course Handbook Series 249, 251, 256–60 (November–December 1990) ("consistent with the language and overall scheme of the statute, a plaintiff should be able to hold a corporate entity liable under RICO when the corporation received a benefit from the racketeering activity of its agent/employee"). *But see* Maria M. Romani, Comment, Civil RICO and Vicarious Corporate Liability: Shrinking Civil RICO Back to Its Originally Intended Congressional Size, 15 Ohio N.U.L.Rev. 695, 703 (1988) (citing legislative history and arguing purpose of civil damages is to drive corrupt enterprises from marketplace, and vicarious liability does not serve that purpose).

This is a difficult question, in part, because of the very same issues underlying the non-identity rule. Congress carefully defined the type of person who violates § 1962(c), and the Court acknowledges that this supports the argument that Congress did not intend for partnership liability to apply to § 1964(c) suits for § 1962(c) violations. Nevertheless, in light of the statute's purposes and the caselaw from the circuit courts discussed herein, this is not a sufficiently clear indication that Congress meant to forsake traditional notions of partnership liability when it enacted §§ 1962(c) and 1964(c).

For example, compare *Carpenter v. Harris, Upham & Co., Inc.,* 594 F.2d 388, 393–94 (4th Cir.), *cert. denied* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), in which the Fourth Circuit addressed the "good faith" defense to securities claims under 15 U.S.C. § 78t(a). Although Congress imposed liability on a party who controls a person who violates the statute, it explicitly excluded liability when the controlling person acts in good faith and did not induce the violations.[5] The Court relied on this language in holding that a broker-dealer is not liable for every violation of a supervised individual. *See id.* 594 F.2d at 394. The Court takes no position on the application of respondeat superior under the securities laws or the meaning of the *Carpenter* decision; rather, it uses this statute as a means of comparison. This is the type of statutory language that might support a holding that partnership liability or traditional agency principles do not apply to a particular federal statute. The Court finds no equivalent language in § 1962(c) or § 1964(c), and is instead persuaded by the reported decisions holding that partnership liability applies to violations of § 1962(c), albeit with an exception for cases implicating the non-identity rule.

▇▇▇▇ Plaintiffs' allegation is that Kersner violated RICO while providing services to Clott and Capital. Kersner's alleged acts of transferring money, making fraudulent representations to victims, and pitching the Program to potential lenders are acts that fall within the scope of the work of a large law firm representing a corporate client. Capital was a paying client of Ross & Hardies, and the firm benefited from Kersner's representation of that client, including the alleged

to incorporate all aspects of the prior law. *See Tafflin v. Levitt,* 493 U.S. 455, 462, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).

**5.** As quoted by the Court, the language read, in part, "Every person who, directly or indirectly, controls any person liable under any provision

... shall also be liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Carpenter,* 594 F.2d at 393 (quoting 15 U.S.C. § 78t(a)).

RICO violations. Holding Ross & Hardies liable for the RICO violations of Kersner would provide the firm, and other law firms, with a powerful incentive to take steps to prevent future violations and will assist in providing compensation to the victims of the racketeering activity.

### D. RICO Injury

Section 1964(c) provides a civil remedy to people who have been injured in their business or property by a violation of § 1962. The Fourth Circuit has read § 1964(c) as requiring (1) an injury to business or property, and (2) that the injury was caused by the predicate acts of racketeering activity. *See Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988). Defendant argues that Plaintiffs have failed to satisfy the causation requirement, contending that the Plaintiffs were injured when they joined the 7.5% Program, which occurred before the money transfers that constitute the predicate acts.

Defendant's argument is not persuasive. Kersner is alleged to have committed predicate acts by making fraudulent representations to the victims, inducing them to enroll in the Program. Sec.Am.Compl. ¶¶ 31–32. If Defendant believes the injury took place when the victims joined the Program, then Kersner's alleged misrepresentations would have been a cause of the injuries. In addition, the Court believes that the injuries took place not when the victims joined the Program, but when their money was fraudulently diverted. Thus, if Kersner committed predicate acts by directing the transfers of money, his predicate acts were a cause of the injuries claimed by the Plaintiffs.

### III. The State Law Claims

Counts I, II, and III of the complaint assert claims of aiding and abetting fraud, aiding and abetting negligent misrepresentation, and aiding and abetting conversion. The State of Maryland recognizes aiding and abetting tort liability. *See Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.,* 340 Md. 176, 199–201, 665 A.2d 1038

(1995); 21 Md.Law Encycl. *Torts* § 7 (1997). The defendant is liable if he encourages, incites, aids, or abets the acts of the direct perpetrator of the tort. *See id.* at 199, 665 A.2d 1038 (quoting *Duke v. Feldman,* 245 Md. 454, 457, 226 A.2d 345 (1967)). There are factual issues as to whether Ross & Hardies did anything to encourage any of the torts allegedly committed. In that these are factual issues, the Court will not dismiss these counts from the complaint.

Count V [6] asserts a claim of partnership liability against Ross & Hardies. In light of the discussion in Section II.C concerning the scope of Kersner's work, the Court will not dismiss Count V.

### Conclusion

According to the complaint, Clott and Kersner used Capital to run the 7.5% Program scheme, whereby they persuaded homeowners to mortgage their homes and turn over the proceeds to Phoenix. Kersner allegedly helped direct the recruitment of homeowners and mortgage lenders, and also helped direct the fraudulent transfers of the mortgage proceeds. These were the key acts of the scheme, and if the allegations are true then Kersner may be liable for directing an enterprise through a pattern of racketeering activity. The acts, if committed, were within the scope of Ross & Hardies's business as a large law firm serving the needs of corporate client. As a result, Ross & Hardies may be held liable under §§ 1962(c) and 1964(c) following traditional doctrines of partnership liability. The Defendant's motion to dismiss will be denied, and a separate order consistent with this memorandum opinion will follow.

### ORDER

Pursuant to the memorandum opinion, it is this 10th day of June, 1998, ORDERED:

1. That the Defendant's motion to dismiss the second amended complaint [20–1] BE, and the same hereby IS, DENIED;

2. That the Defendants answer or otherwise respond to the second amended com-

---

**6.** Count IV alleges a claim of negligent misrepresentation against Defendant Phoenix only.

plaint within ten (10) days of the date of this order, and

3. That the Clerk of the Court mail copies of the memorandum opinion and order to all counsel of record.